1  VERNA WEFALD
   State Bar No. 127104
2  65 North Raymond Ave. # 320
   Pasadena, California 91103
3  Telephone: (626) 577-2658
   Facsimile: (626) 685-2562
4  Email: verna@vernawefald.com

5  Attorney for Petitioner Hsiu Ying Tseng

6

7              UNITED STATES DISTRICT COURT

8            CENTRAL DISTRICT OF CALIFORNIA

9
   HSIU YING TSENG,                    )     Civ. No.
10                                     )
            Petitioner,                )
11                                     )
        v.                             )     **MEMORANDUM OF POINTS**
12                                     )     **AND AUTHORITIES IN**
   RICHARD MONTES, Warden,             )     **OF PETITION FOR WRIT OF**
13                                     )     **HABEAS CORPUS UNDER**
            Respondent.                )     **28 U.S.C.§2254; EXHIBITS**
14 _____    )

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Trial Court, Case No. BA394495 . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Court of Appeal, Case No. B270877. . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    California Supreme Court, Case No. S253560 . . . . . . . . . . . . . . . . 9

      D.    United States Supreme Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    The Treatment of Chronic Pain . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.    Drug Addiction and Controlled Substances . . . . . . . . . . . . . . . . . . 11

      D.    The Physician's Standard of Care . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.    Dr. Lisa Tseng . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      F.    The DEA Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      G.    The Financial Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      H.    THE SECOND DEGREE MURDER COUNTS. . . . . . . . . . . . . . . . 21

            1.    Vu Nguyen (Count 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            2.    Steve Ogle (Counts 2 and 3) . . . . . . . . . . . . . . . . . . . . . . . . 23

            3.    Joseph Rovero (Count 4). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      I.    UNCHARGED DEATHS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            1.    Matthew Stavron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            2.    Ryan Latham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            3.    Naythan Kenney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

J.     UNLAWFUL PRESCRIBING COUNTS . . . . . . . . . . . . . . . . . . . . . 30

    1.     Joshua Chambers (Count 8) . . . . . . . . . . . . . . . . . . . . . . . . 30

    2.     Michael Katsnelson (Count 13) . . . . . . . . . . . . . . . . . . . . 32

    3.     Joseph Gomez (Count 10) . . . . . . . . . . . . . . . . . . . . . . . . . 32

K.     The Opinion of the Court of Appeal . . . . . . . . . . . . . . . . . . . . . . . . 33

V.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

I.     THE EVIDENCE THAT PETITIONER WAS GUILTY OF SECOND DEGREE MURDER AS TO VU NGUYEN (COUNT ONE) WAS INSUFFICIENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.     Second Degree Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    1.     Implied Malice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    2.     Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

D.     Involuntary Manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

E.     The Evidence of Proximate Cause Was Insufficient . . . . . . . . . . . 44

F.     The Evidence of Implied Malice Was Insufficient . . . . . . . . . . . . . 44

G.     The Opinion of the Court of Appeal Relied on Three Cases That Were Inapposite . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

II.     THE EVIDENCE THAT PETITIONER WAS GUILTY OF SECOND DEGREE MURDER AS TO STEVEN OGLE (COUNT TWO) WAS INSUFFICIENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

III.     THE EVIDENCE THAT PETITIONER WAS GUILTY OF SECOND DEGREE MURDER AS TO JOSEPH ROVERO (COUNT FOUR) WAS INSUFFICIENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.     THE ADMISSION OF SIX UNCHARGED DEATHS UNDER EVIDENCE CODE SECTION 1101(B) VIOLATED PETITIONER'S RIGHT TO DUE PROCESS BECAUSE IT WAS NOTHING MORE THAN PROPENSITY EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A.  The Defense Moved to Exclude Evidence of Uncharged Deaths as Irrelevant and Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B.  Evidence of Uncharged Misconduct May Never Be Introduced to Show That a Defendant Is a Bad Person . . . . . . . . . . . . . . . . . . . . . 59

C.  The Trial Court Abused its Discretion by Failing to Scrutinize the Evidence Which Did Not Show Notice . . . . . . . . . . . . . . . . . . . . . . . 62

D.  Petitioner Was Severely Prejudiced by the Admission of Six Uncharged Deaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

V.  THE FAILURE TO STRIKE JOHN MATA'S TESTIMONY AND DISMISS COUNT 14 AFTER THE PROSECUTOR COMMITTED MISCONDUCT DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A.  In Violation of the Court's Order, the Prosecutor Elicited from Witness John Mata, That His Son Nicholas Had Died . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

B.  After the Prosecutor Committed Misconduct it Was Impossible for Petitioner to Get a Fair Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

VI.  THE COURT'S FAILURE TO GRANT A MISTRIAL WHEN THE PROSECUTOR AGAIN COMMITTED MISCONDUCT BY ELICITING THAT MICHAEL HUGGARD (COUNT 11) DIED, VIOLATED PETITIONER'S RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENT. . . . . . . . . . 72

VII.  THE COURT'S REOPENING OF CLOSING ARGUMENT OVER DEFENSE OBJECTION WHEN THE JURY STATED IT COULD NOT REACH A UNANIMOUS VERDICT ON SECOND DEGREE MURDER COERCED A UNANIMOUS VERDICT IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS . . . . . . . . . . . . . . . . . . . . 75

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

B.  Reopening Argument Was Coercive . . . . . . . . . . . . . . . . . . . . . . . . . 79

1.  Coercing a Deadlocked Jury into Returning a Unanimous Verdict Is Coercive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

2.  The Trial Court Has Discretion to Permit Additional Argument So Long as it Is Not Coercive . . . . . . . . . . . . . . . . . . . . . . . . . 80

3.  Additional Argument over Defense Objection after Two Supplemental Instructions Were Already Given Was Coercive . . . 81

iii

VIII.   PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH
        AMENDMENTS TO A FAIR TRIAL AND TO DUE PROCESS WERE
        VIOLATED BY CUMULATIVE ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . 82

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

CERTIFICATE OF SERVICE

EXHIBITS 1-4

iv

# TABLE OF AUTHORITIES

## CASES

*Berger v. United States,* 205 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Brecht v. Abrahamson,* 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . 4, 64, 71, 74, 82

*Burton v. Davis,* 816 F.3d 1132 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chambers v. Mississippi,* 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Darden v Wainwright,* 477 U.S. 161, 181 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 71

*Daubert v. Merrill Doe Pharmaceuticals, Incorporated.,*

509 U.S. 579 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Donnelly v. DeChristoforo,* 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . 70, 74, 82

*Dowling v. United States,* 493 U.S. 342 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Einaugler v. Supreme Court of State of N.Y..*

109 F.3d 836 (2nd Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*Einaugler v. Supreme Court of the State of New York,*

 918 F. Supp. 619 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Estelle v. McGuire,* 502 U.S. 62 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 60

*Harrington v. Richter,* 562 U.S. 86 (2011) . . . . . . . . . . . . . . . . . . 3, 50, 51, 54, 74

*In re Winship,* 397 U.S. 398 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Jackson v. Virginia,* 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 54

*Jenkins v. United States,* 380 U.S. 445 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Jiminez v. Meyers,* 40 F.3d 976 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Juan H. v. Allen,* 408 F.3d 1262 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Kipp v. Davis,* 971 F.3d 939 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Lowenfield v. Phelps,* 484 U.S. 231 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*Maxwell v. Roe,* 628 F.3d 486 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*McKinney v. Rees* 993 F.2d 1378 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . 60, 61, 63

*Michelson v. United States,* 335 U.S. 469 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Miller-El v. Cockrell,* 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Montana v. Egelhoff,* 518 U.S. 37 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*O'Neal v. McAninch,* 513 U.S. 432 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Patterson v. Stewart,* 251 F.3d 1243 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 2

*Parle v. Runnels* 505 F.3d 922 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*People v Pike,* 197 Cal.App.3d 732 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44

*People v. Ayala,* 23 Cal.4th 225 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*People v. Balcolm,* 37 Cal.2d 865 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 58

*People v. Blakeley,* 23 Cal.4th 82 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*People v. Brown,* 91 Cal.App.4th 246 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*People v. Butler,* 187 Cal.App.4th 998 (2010). . . . . . . . . . . . . . . . . . . . . . . . . passim

*People v. Carpenter,* 15 Cal.4th 312 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*People v. Carter,* 68 Cal.2d 810 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

*People v. Catlin,* 26 Cal.4th 81 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*People v. Cervantes,* 24 Cal.4th 860 (2001) . . . . . . . . . . . . . . . . . . . . . . 41, 44, 53

*People v. Chun,* 45 Cal.4th 1172 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*People v. Collins,* 49 Cal.4th 175 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*People v. Cravens,* 53 Cal.4th 500 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*People v. Ewoldt,* 7 Cal.4th 380 (1994) . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 61, 63

*People v. Falsetta,* 21 Cal.4th 903 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 63

*People v. Felix,* 14 Cal.App.4th 997 (1993) . . . . . . . . . . . . . . . . . . . . . . . 60, 63, 64

*People v. Hansen,* 59 Cal.App.4th 473 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*People v. Hardy,* 33 Cal.2d 52 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*People v. Jennings,* 50 Cal.4th 616 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*People v. Kennedy,* 36 Cal.4th 595 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Klvana,* 11 Cal.App.4th 1679 (1992). . . . . . . . . . . . . . . . . . . . . . . . 49, 56

*People v. Knoller,* 41 Cal.4th 139 (2007) . . . . . . . . . . . . . . . . . . . 39, 40, 47, 51, 53

*People v. Navarro,* 40 Cal.4th 668 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

 *People v. Nieto Benitez,* 4 Cal.4th 91 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*People v. Panah,* 35 Cal.4th 395 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*People v. Penny,* 44 Cal.2d 861 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*People v. Phillips,* 64 Cal.2d 574 (1966). . . . . . . . . . . . . . . . . . . . . . . 40, 69, 70, 83

*People v. Pitts,* 223 Cal.App.3d 606 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Protopappas,* 201 Cal.App.3d 152. . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*People v. Rios,* 23 Cal.4th 450 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*People v. Rodriguez,* 42 Cal.3d 730 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

*People v. Rojas,* 15 Cal.3d 540 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*People v. Sanchez,* 26 Cal.4th 834 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*People v. Stiller,* 242 Mich.App. 38 (200). . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

*People v. Thompson,* 27 Cal.3d 303 (1980). . . . . . . . . . . . . . . . . . . . . . . 59, 60, 63

*People v. Warren,* 45 Cal.3d 471 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Watson,* 30 Cal.3d 290 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*People v. Williams,* 49 Cal.4th 405 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Young,* 156 Cal.App.4th 1165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Rose v. Lundy,* 455 U.S. 509 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Taylor v. Kentucky,* 436 U.S. 478 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Taylor v. Maddox,* 366 F.3d 992 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . 3, 33, 71

*United States Evanston,* 631 F.3d 1090 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . 79

*United States v. Castillo,* 140 F.3d 874 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . 61

*United States v. Mason* 658 F.2d 1263 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . 80

*Weaver v. Thompson,* 197 F.3d 359 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 79

vii

*Wiggins v. Smith,* 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 50, 51, 54

*Williams (Terry) v. Taylor,* 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATUTES

28 U.S.C.§2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Bus. & Prof. Code § 2266. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Evid. Code § 1101(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 64

Evid. Code, § 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Penal Code §  654. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Penal Code § 192(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Penal Code § 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Penal Code § 1118.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Penal Code § 1140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

VERNA WEFALD
State Bar No. 127104
65 North Raymond Ave. # 320
Pasadena, California 91103
Telephone: (626) 577-2658
Facsimile: (626) 685-2562
Email: verna@vernawefald.com

Attorney for Petitioner Hsiu Ying Tseng

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HSIU YING TSENG,                    )    Civ. No.
                                    )
                 Petitioner,        )
                                    )
          v.                        )    **MEMORANDUM OF POINTS**
                                    )    **AND AUTHORITIES IN**
RICHARD MONTES, Warden,             )    **OF PETITION FOR WRIT OF**
                                    )    **HABEAS CORPUS UNDER**
                 Respondent.        )    **28 U.S.C.§2254; EXHIBITS**
_____)

Petitioner Hsiu Ying "Lisa" Tseng, by counsel, respectfully submits this memorandum of points and authorities in support of her petition for writ of habeas corpus under 28 U.S.C. § 2254.

## I. PRELIMINARY STATEMENT

Petitioner Hsiu Ying Tseng (CDCR No. WF41771) is unconstitutionally restrained of her liberty by her custodian, Richard Montes, Warden of the California Institution for Women in Corona, California. Petitioner, a physician, is serving a sentence of 30 years to life after having been convicted by a jury of three counts of second degree murder and twenty-one counts of unlawful prescribing of opiates.

Petitioner appears to be the first and perhaps only doctor convicted of murder in this country for prescribing opiates. The Court of Appeal upheld her

convictions in an opinion that misstated the facts and relied on law that was inapposite.  The state appellate court also upheld the admission of six uncharged deaths.  However, as to three of them, two died of heroin overdoses, a third died by suicide, and a fourth died of a preexisting heart condition – which Petitioner had nothing to do with.  In violation of a court order, the prosecutor elicited that two more patients had died.  The Attorney General and the court agreed that this was misconduct but upheld the convictions despite the fact that the jurors were clearly swayed by this highly emotional testimony and were initially unable to agree on second degree or involuntary manslaughter.

## II.  THE AEDPA

The issues raised in the instant 2254 petition are  exhausted.  <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). This petition is timely filed. § 2244(d)(1)(A). *Patterson v. Stewart*, 251 F.3d 1243 (9th Cir. 2001).

Under § 2254(d)(1) and (2) a writ may issue if the state court decision:

(1) was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States.  Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court on a set of materially indistinguishable facts.  Under the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams (Terry) v. Taylor*, 529 U.S. 362, 405 (2000).

In order for a federal court to find a state court's application of United States Supreme Court precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous. The state court's application must have been "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

The state court's rejection of Petitioner's claims is contrary to and/or involved an unreasonable application of clearly established United States Supreme Court precedent and is an objectively unreasonable application of the facts to clearly established United States Supreme Court precedent. 2254(d)(1) and (2); *Wiggins v. Smith*, 539 U.S. at 528.

"[T]he state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 106. (2011).

The recitation of facts throughout the state court opinion is not entitled to a presumption of correctness because it misstates material points of fact. 28 U.S.C. § 2254(e)(1). "Failure to consider key aspects of the record is a defect in the fact finding process." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), citing *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003). To fatally undermine the fact-finding process, "the overlooked and ignored evidence must be highly probative and central to petitioner's claims." *Taylor v. Maddox*, at 1001.

When the state court disregards relevant evidence about the claim it is not entitled to a presumption of correctness. *Burton v. Davis*, 816 F.3d 1132, 1155-59 (9th Cir. 2016); *Maxwell v. Roe*, 628 F.3d 486, 504-05 (9th Cir. 2010).

The state court errors "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

While the federal court must give deference to the state court on habeas review, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. at 340.

## III. PROCEDURAL HISTORY

**A.     Trial Court, Case No. BA394495**

On July 10, 2012, an information was filed in the Los Angeles County Superior Court charging Petitioner with three counts of second degree murder [Penal Code "PC" § 187] (counts 1, 2, and 4 ) and twenty-one counts of unlawful controlled substance prescription [Health and Safety Code "HS" § 11153(a)] (counts 3, 5-23); and one count of obtaining controlled substance by fraud [HS § 11173(a)] (count 24). (14 CT 2640-2651.)[1]

The second degree murder counts (PC § 187) were as follows:

| Count | Victim | Date |
|-------|--------|------|
| 1 | Vu Nguyen | March 2, 2009 |
| 2 | Steven Ogle | April 9, 2009 |
| 4 | Joseph Rovero | December 18, 2009 |

---

[1] "CT" stands for Clerk's Transcript.  "RT" stands for Reporter's Transcript. "AOB" stands for Appellant's Opening Brief.

The unlawful prescribing counts [HS § 11153(a)] were as follows:

| Count | Victim | Drug | Date |
|---|---|---|---|
| 3 | Steven Ogle | methadone | April 7, 2009 |
| 5 | Joseph Rovero | oxycodone | December 9, 2009 |
| 6 | Brandon Barnes | opana | March 2, 2009 |
| 7 | Donald Bender | methadone | December 13, 2009 |
| 8 | Joshua Chambers | hydrocodone | May 27, 2009 |
| 9 | Michael Chiaverini | hydrocodone | July 22, 2009 |
| 10 | Joseph Gomez | oxycodone | August 26, 2009 |
| 11 | Michael Huggard | opana | August 12, 2009 |
| 12 | Alexander Huy | hydrocodone | June 21, 2010 |
| 13 | Michael Katsenelson | fentanyl | April 16, 2009 |
| 14 | Nicholas Mata | hydrocodone | February 1, 2010 |
| 15 | Lana Rau | hydrocodone | October 5, 2009 |
| 16 | Brian Simmons | opana | August 17, 2009 |
| 17 | Justin Smith | opana | June 23, 2009 |
| 18 | Casey Yoder | hydrocodone | February 8, 2010 |
| 19 | Spec. Agent Brian Sale | hydrocodone | July 22, 2009 |
| 20 | Spec. Agent Jeff Gomez | methadone | February 22, 2010 |
| 21 | Spec. Agent Jeff Gomez | suboxone | March 9, 2010 |
| 22 | Spec, Agent Johnny Tsang | hydrocodone | March 9, 2010 |
| 23. | Spec. Agent Jeff Gomez | alprazolam | July 9, 2010 |

The controlled substance by fraud count [HS 11173(a)] count was:

| | | | |
|---|---|---|---|
| 24 | Joseph Rau | oxycodone | October 12, 2009 |

On August 26, 2015, jury selection began before the Honorable George G. Lomeli. (17 CT 3260-3261.) The next day, on August 27, 2015, Petitioner filed a motion in limine to require the prosecution to identify with specificity all alleged

conduct under Evid. Code section 1101(b) it seeks to admit at trial, offer of proof and purpose of admission.  (17 CT 3262-3273, 3274-3281.) The 1101(b) motion was denied.  (2 RT F-17.)

On October 7, 2015, Petitioner's motion to acquit on the three murder counts (counts 1, 2, and 4) under Penal Code section 1118.1 was denied.  (23 RT 7630.)

Jury deliberations began on October 19, 2015, and continued on October 20, 21, 22, 23, 26, 27, and 28. The jury asked numerous questions.  (18 CT 3484-3485, 3489.)

On October 29, 2015,  the jury announced it was "split on second degree." (18 CT 3505.) The court gave two supplemental instructions.  Over defense objection, the court permitted the parties to reargue for ten minutes each. (29 RT 11703.)

The next day, October 30, 2015, Petitioner was convicted of second degree murder on counts 1, 2, and 4. (19 CT 3576-3612.) As to the drug counts, Petitioner was acquitted of count 22, but convicted of the other counts.  (29 RT 12003-12010.)

On February 5, 2016, Petitioner was sentenced to 30 years to life.  (19 CT 3639, 3758-3775.)

On April 15, 2016, Petitioner was ordered to pay $2,129.26 in restitution to Steven Rovero's mother.  (ART 4.)

**B.**     **Court of Appeal, Case No. B270877**

On August 16, 2017, Petitioner filed an AOB which raised the following issues:

I.   THE EVIDENCE THAT APPELLANT WAS GUILTY OF SECOND DEGREE MURDER AS TO VU NGUYEN (COUNT ONE) WAS INSUFFICIENT

II.  THE EVIDENCE THAT APPELLANT WAS GUILTY OF SECOND DEGREE MURDER AS TO STEVEN OGLE (COUNT TWO) WAS INSUFFICIENT

III. THE EVIDENCE THAT APPELLANT WAS GUILTY OF SECOND DEGREE MURDER AS TO JOSEPH ROVERO (COUNT FOUR) WAS INSUFFICIENT

IV.  THE COURT'S FAILURE TO UNSEAL THE  AFFIDAVIT TO SUPPORT PROBABLE CAUSE TO OBTAIN THE SEARCH WARRANT AND ITS FINDING OF PROBABLE CAUSE AT AN IN CAMERA HEARING VIOLATED APPELLANT'S RIGHTS UNDER THE FIRST, FOURTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

V.   THE ADMISSION OF SIX UNCHARGED DEATHS UNDER EVIDENCE CODE SECTION 1101(B) VIOLATED APPELLANT'S RIGHT TO DUE PROCESS BECAUSE IT WAS NOTHING MORE THAN PROPENSITY EVIDENCE

VI.  THE FAILURE TO STRIKE JOHN MATA'S TESTIMONY AND DISMISS COUNT 14 AFTER THE PROSECUTOR COMMITTED MISCONDUCT DEPRIVED APPELLANT OF DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

VII. THE COURT'S FAILURE TO GRANT A MISTRIAL WHEN THE PROSECUTOR AGAIN COMMITTED MISCONDUCT BY ELICITING THAT MICHAEL HUGGARD (COUNT 11) DIED, VIOLATED APPELLANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

VIII.   THE COURT'S REOPENING OF CLOSING ARGUMENT OVER
        DEFENSE OBJECTION WHEN THE JURY STATED IT COULD
        NOT REACH A UNANIMOUS VERDICT ON SECOND DEGREE
        MURDER COERCED A UNANIMOUS VERDICT IN VIOLATION
        OF APPELLANT'S DUE PROCESS RIGHTS

IX.     THE COURT'S IMPOSITION OF CONSECUTIVE SENTENCES ON
        COUNTS 1 AND 4 VIOLATED DOUBLE JEOPARDY UNDER PENAL
        CODE SECTION 654

X.      APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH
        AMENDMENTS TO A FAIR TRIAL AND TO DUE PROCESS WERE
        VIOLATED BY CUMULATIVE ERROR

On December 14, 2018, the Court of Appeal affirmed Petitioner's convictions in an opinion certified for partial publication. *People v. Tseng*, 30 Cal.App.5th 117.  (Exhibit 1 [slip opinion].)

On December 31, 2018, Petitioner filed a petition for rehearing which raised the following issues:

I.      REHEARING SHOULD BE GRANTED BECAUSE THE OPINION
        MISSTATES OR OMITS MATERIAL FACTS

II.     REHEARING SHOULD BE GRANTED BECAUSE THE CASES THE
        COURT RELIES ON TO SUPPORT IMPLIED MALICE MURDER ARE
        INAPPOSITE

III.    REHEARING SHOULD BE GRANTED BECAUSE THE OPINION FAILS
        TO ACKNOWLEDGE THAT THE SEALED AFFIDAVIT DID NOT EVEN
        ALLEGE PROBABLE CAUSE TO SUPPORT MONEY LAUNDERING

IV.     REHEARING SHOULD BE GRANTED BECAUSE THE
        PROSECUTORIAL MISCONDUCT WAS SO PERVASIVE AS TO DENY
        DUE PROCESS

On January 11, 2019, the petition for rehearing was denied. (Exhibit 2.)

**C.     California Supreme Court, Case No. S253560**

On January 15, 2019, Petitioner filed a petition for review in the California Supreme Court, raising all the issues that were raised in the Court of Appeal.

On March 20, 2019, the petition for review was denied.  (Exhibit 3.)

**D.     United States Supreme Court, Case No. 18-9774**

On June 18, 2019, Petitioner filed a petition for writ of certiorari in the United States Supreme Court raising the following issue:

> Whether this Court should finally decide that the admission of irrelevant prior act evidence in a state trial that amounts to nothing more than propensity evidence violates Fourteenth Amendment due process, a question left open by *Estelle v. McGuire*, 502 U.S. 62, 70 (1991)?

On October 7, 2019, the petition for writ of certiorari was denied. (Exhibit 4.)

## IV.  STATEMENT OF FACTS

**A.     Introduction**

Petitioner was convicted of second degree murder for the deaths of patients Vu Nguyen, Steven Ogle, and Joseph Rovero.  The prosecution's theory as to implied malice was that she had been notified by coroners that several patients had

died yet did not change her prescribing habits.   However, as defense counsel repeatedly pointed out, Petitioner was never notified as to the cause of death and/or told that her treatment was responsible for these patients' death.

Because Petitioner argues that the evidence of second degree murder was insufficient (Clams I, II, and III) it is necessary out the facts in great detail.

## B.      The Treatment of Chronic Pain

Chronic pain, particularly back pain, is the leading cause of disability in the United States.  (6 RT 1617.)  Prior to 2002, most doctors had limited training in pain management and pain was under treated.  (16 RT 5444-5446.)  To improve the prescribing of pain medication, the  Center for Disease Control ("CDC") spearheaded the training of  family practice and general practitioners in pain management.[2]  (6 RT 1621-1622.)

Purdue Pharma  marketed Oxycontin (used to treat cancer patients) to general practitioners. (16 RT 5444.) Nearly eighty percent of opiates like Vicodin and OxyContin are prescribed by general practitioners, not pain medicine specialists. (16 RT 5436.)   From 2002 to 2009, prescription drug use and accidental overdose quadrupled. (6 RT 1621.)

Under the California Patients Bill of Rights every patient has the right to be treated for pain. Without treatment, the physical and mental consequences can be severe.   California law[3] also provides that no physician shall be subject to disciplinary action for prescribing or administering controlled substances to treat intractable pain.  Physicians, however, are "walking a tightrope" and reluctant to

---

[2]  Two physicians, Drs. Ezekiel Fink and Walter Strauser, testified regarding the standard of care, generally, and as to departures made by Petitioner.

[3]  Business and Professions Code section 2241.5 subdivision (b)

treat pain, resulting in a shortage of pain management physicians.  (6 RT 1637-1640.)

## C.    Drug Addiction and Controlled Substances

Only a small minority of people who take opiates will become addicted. (6 RT 1578-1579.)  Drug addicts were once viewed as weak-willed but are now considered to suffer a neurobiological disease.  An addict's main goal in life is to get high which can lead to infections, liver damage, and psychological problems (depression and suicide). (6 RT 1569-1571.) People can overdose with just an opioid or a combination of drugs.  Not all who overdose die, but brain damage is possible. (6 RT 1572-1573.)

The more opioids a person takes renders them less effective over time as the patient develops a tolerance.  (15 RT 5170.) Mild opioid withdraw causes anxiety.  Severe withdrawal is associated with intense pain, cramping, diarrhea, and vomiting.  Some withdrawal causes seizures and can be fatal (e.g. carisoprodol, Soma.).  (6 RT 1575-1576.)

Opioids relieve pain by binding to specific receptors within the central nervous system.  They dampen the impulses to the brain so it perceives less pain.  (6 RT 1520.)  Opioids also bind to other organs in the body, causing side effects (e.g. drowsiness, nausea, constipation) as well as respiratory suppression which can lead to overdose, coma, and death.  (6 RT 1520-1523, 1528.)

Because opioids produce a high or euphoria they are highly regulated as controlled substances, ranging from Schedule I (illegal) through V (cough suppressant).  Schedule I drugs are deemed highly abusable with no medical purpose (e.g. heroin, methaqualone, LSD, and marijuana).  (6 RT 1543-1545.)  Except for Schedule I, doctors can prescribe controlled substances if they have a DEA license.

Doctors need another special license to prescribe methadone, which is usually confined to clinics treating heroin addiction.  (6 RT 1550.)

Common opioids are morphine, oxycodone, oxymorphone, methadone, and hydrocodone, the most commonly prescribed drug in the country (e.g. Norco, Vicodin, Lortab). (6 RT 1522.)

Opioid abusers often combine them with other drugs like sedatives or depressants, making it difficult to breathe.  Abusers also tamper with these drugs, increasing the risk of overdose or death.  When swallowed as intended, opioids take effect within a certain number of minutes and work over the course of hours.  Addicts can't wait that long for the rush or euphoria they seek, so they crush the tablets and snort them, or heat them for injecting into their veins.  Injecting drugs causes them to reach the brain very rapidly, accelerating the high.  (6 RT 1524-1525.)

Other commonly abused controlled drugs are:

● Bbenzodiazepines ( sedatives or tranquilizers to treat anxiety or insomnia) such as Librium, Valium (diazepam), Xanax (alprazolam), and Ativan (lorazepam).  Opioid addicts commonly use benzodiazepines to soften  withdrawal.  But withdrawal from these drugs are also risky. Mixing benzodiazepines with alcohol heightens the risk for overdose.  (6 RT 1530-1534.)

● Carisoprodol (e.g. Soma), a muscle relaxant.  Withdrawal can be quite severe, leading to seizure and death.  (6 RT 1536-1537.)

● Amphetamines (e.g. Adderall and Ritalin), stimulants that speed up the functioning of the brain.  They are used to treat excessive sleepiness, narcolepsy, sleep apnea, and Attention Deficity Hyperactivity Disorder ("ADHD").  They can cause decreased appetite and insomnia as well as increased heart rate and blood pressure.  Withdrawal can make a person psychotic.   (6 RT 1538-1540.)

● Morphine is the gold standard of opioids because it is a natural compound that has been around for millennia. Fentanyl (Duragesic) and Oxycodone are made in a lab. (6 RT 1547.)

● Methadone (used to treat heroin addiction) is a synthetic opioid developed in Germany in WWII, as a pain reliever, when morphine was scarce. (6 RT 1549.)

● Roxicodone and OxyContin (oxycodone) are very potent and used to treat cancer patients with chronic severe pain or end of life patients. Percocet is a shorter acting and less potent oxycodone. (6 RT 1551-15522.)

● Oxymorphone (Opana); buprenorphine (Suboxone); and codeine cough syrup are also controlled substances. (6 RT 1565-1566.)

**D.     The Physician's Standard of Care**

The physician's standard of care is determined by the medical or legal community in order to protect the public. It is generally defined as the level of skill, knowledge, and care in diagnosis and treatment that a reasonably careful physician would apply given similar clinical circumstances. (6 RT 1593.)

Doctors are not legally permitted to prescribe drugs to a known drug addict in order to maintain their addiction. (6 RT 1577-1579.) After the Drug Addiction Treatment Act of 2000, a general physician is permitted to use a drug like suboxone to treat addiction in a general office practice. Before that, doctors could only refer addicts to a methadone clinic. To treat addiction, a doctor has to get a second DEA number, obtain 8 hours of certification, and do the necessary bookkeeping. The doctor is limited to treating 30 patients in the first year in an office-based practice and up to 100 patients after that. (6 RT 1560-1561.)

In the practice of pain management, a doctor should start with the simplest and safest intervention to avoid harm to the patient. (6 RT 1535.)

Physicians are required to carefully determine who is a candidate for opioids to avoid exposing the patient to unnecessary risks and to prevent the drugs from getting on the streets.  (6 RT 1529.)

Opioids should not be prescribed to just anyone complaining about pain but only to those who have severe or moderately severe pain and who have not responded to safer treatments such as exercise, physical therapy, or over the counter medicines (e.g. ibuprofen).  (6 RT 1528.)

Doctors must be on the watch for signs that the patient is an addict, but everything needs to be put in context.  Red flags tend to be: men, young people; a history of legal problems; a  prior history of drug or alcohol  abuse;  addiction that runs in the family; no records of prior treatment; and unwillingness to name prior treating physicians.  (6 RT 1583.)

If a patient refuses diagnostic testing such as an x-ray or a urine test, that could be a red flag.  But some of these tests (e.g. an x-ray or MRI) are very expensive and if the patient can't afford it is difficult to insist.  (6 RT 1587.)

The method of payment is not a factor in a physician's standard of care. Paying with cash may mean the patient had trouble getting insurance even with the Affordable  Care  Act.   Also,  the  doctor  may  not  accept  the  patient's  particular insurance. (6 RT 1609-1613.)

To monitor for addiction, physicians in California can now access CURES ("Controlled Substance Utilization Review and Evaluation System") to see what controlled substances the patient has used, and what doctors or pharmacies he has been to in past 12 months.[4]  (6 RT 1587.)

For pain, the first thing a doctor should do is a physical examination, based on the patient's chief complaint. and order diagnostic testing.  It is important

---

[4] In 2009, CURES was first available to doctors in real time, online.  From 2003 to 2009, it was available in a week by sending a fax to the Department of Justice. (23 RT 7519-7520.)

to obtain prior medical records to corroborate what patient is saying.  The doctor should try to find out if there is a history of drug or alcohol abuse in the patient and/or his or her family.  After coming up with a potential diagnosis the doctor and patient can determine the best course of action. (6 RT 1598-1601.)

As to medication, doctors must monitor whether the patient is tolerating it, experiencing side effects, and using it properly.  (6 RT 1605.)

Adequate and accurate record keeping, required by law (Bus. & Prof. Code § 2266), is  very important at all stages of interaction, particularly as patients change doctors all the time.  (6 RT 1606.)

A departure from the standard of care means the treatment is not what a reasonably careful physician would do under similar circumstances.  A simple departure is negligence.  An extreme departure is gross negligence.  (6 RT 1608.) However, if a physician did not do everything he or she should have done that does not mean the standard of care was violated.  It depends on the circumstances. (6 RT 1616.)

Prior to 2005, it was less common for doctors to do urine tests to screen patients.  During 2007 to 2010, requiring a toxicology screen was not a requirement of the standard of care.  (6 RT 1632.)

It is "extremely common" to see mental health problems, anxiety and malingering in pain patients.  A patient could be trying to get Social Security Disability and/or lying about how much alcohol they drink. The physician should set boundaries and may have to confront the patient.  (6 RT 1618-1627.)

A lot of pain management is subjective and the doctor ultimately has to take the patient at face value.  There is only so much one can do to detect whether the patient is being truthful.  (6 RT 1629.) However, if someone admits he is an addict that means he cannot control himself. Addicts need to see an addiction specialist. (16 RT 5484-5486.)

1       Pharmacists have a duty to warn patients not to mix opioids with other

2   drugs and alcohol, and put stickers on pill bottles.  (16 RT 5483.)

3       Dr. Fink (board certified in neurology, pain medicine, and brain injury

4   medicine) said that if a patient died in one's case that would "have a profound

5   impact" to "make me go back and try to figure out if there was something that could

6   have been done different to prevent that death." (15 RT 5178.)  However, opioid

7   overdose deaths happen to good doctors in the course of their practices as well.  A

8   death "does not mean that something wrong was done." (16 RT 5450.)

9

10  **E.    Dr. Lisa Tseng**

11

12       Petitioner, Dr. Lisa Tseng, and her husband Dr. Gene Tu practiced at

13   Advanced Medical Care AAA, located at  1330 South Fullerton Road, Suite 288, in

14   Rowland Heights.   Gloria Rodriguez, the receptionist at the clinic from 2005 to

15   2011, testified under a grant of immunity.   Dr. Tu practiced family medicine.

16   Petitioner was an osteopath and internist, who had previously worked as an

17   infectious disease specialist.   They also provided urgent care. (7 RT 1873-1878,

18   2109, 8 RT 2117.)

19       Petitioner frequently worked nine to twelve hour days.  (7 RT 1909,

20   2117.)  The clinic had four to six medical assistants who took  vital signs and patient

21   information.  (7 RT 18950-1897.)

22       While Rodriguez worked there the record keeping transitioned from

23   paper to computer.   Sometimes doctors did not complete all their paperwork.

24   However, Petitioner told Rodriguez to document everything in the patient charts and

25   not to hide anything. (7 RT 1902-1904.) Petitioner took all calls from pharmacies,

26   the DEA, coroners, and family members.  (7 RT 1925-1927. 2124.)

27       After Petitioner joined the practice the demographics of the patients

28   began to change.  At first, the patients were local Asians or Hispanics who came in

1     for physicals or illness.   After a while, the patients were primarily young white men

2     from out of the area. (7 RT 1873-1878.)

3           Between 2008 and 2010, the waiting time in the clinic went from 15 to

4     30 minutes to several hours.   There could be 20 to 30 patients standing in the lobby

5     or outside.   Some of these patients seemed agitated.   (7 RT 1936-1938.) One time

6     Rodriguez overheard Petitioner say some patients were "druggies, they can wait."

7     (7 RT 1940.)

8           The office kept separate files for those who paid in cash and those who

9     used insurance.   Boxes of files were stored in the hallways.   (7 RT 1879-1885.)   First

10    time patients were charged $68. Subsequent visits cost $48, with additional charges

11    for x-rays and injections.   (7 RT 1892-1895.)   In 2007, 90% of patients were on

12    insurance.   By 2010, 70 to 80% of patients paid cash for both Dr. Tu and Petitioner.

13    (7 RT 1953-1954.) In 2007, the clinic earned about $650 per day.   (7 RT 2122.)   In

14    2010, the practice made between $2,000 and 3,000 a day.   (7 RT 1962.)

15          Petitioner did turn away some problem patients.   Once  a patient stole

16    some syringes from a cabinet.   Petitioner confronted him and refused to see him

17    again.   Another patient cracked the door and had to be taken away by his friend.

18    Another patient was upset at being turned away.   (7 RT 1944-1945, 1970.)

19          Patient Michael Cook overdosed in the office.   Petitioner called the

20    paramedics who revived him Narcan. (20 RT 6611-6619.)   Petitioner refused to see

21    Cook again and would not even take his calls.   (7RT 1976-1980.)

## F.      The DEA Investigation

DEA special agent Robert Harkins began investigating Petitioner in 2008, after her name appeared on a CURES report of patients for another doctor under investigation.[5]   After Harkins noticed people loitering outside the clinic, he interviewed people, including pharmacists,[6] and employed undercover agents.  (4 RT 980-984, 5 RT 1216-1225.)

Harkins instructed the undercover officers to lied to Petitioner to get drugs from Petitioner.  (4 RT 1008-1009.)   The first undercover DEA officers were unable to obtain the prescriptions from Petitioner that they asked for.  So other agents were sent in to try obtain different prescriptions.  (5 RT 1232.)

DEA undercover agent Michael Jett went to Petitioner's clinic on August 6, 2008, to get a prescription for Vicodin, without a specific medical reason, but to feel better.  (8 RT 2419-2421.)  He pretended to be coming from Moreno Valley, 50 miles away.  Petitioner responded that she could not write a prescription without a specific reason.  When Jett said he had lower back pain, Petitioner suggested Motrin. Jett said Vicodin was the only thing that worked.  When he lifted

---

[5] After receiving several complaints, Jennifer Doll of the California Medical Board also began an investigation into Petitioner initially for overprescribing.  Doll gathered coroner's reports, crime scene photos, and toxicology reports from Riverside and Orange Counties, and Maricopa County, Arizona. (20 RT 6660-6662.)

[6] Several pharmacists contacted the DEA about Petitioner after suspicious people sought to fill opioid prescriptions written by Petitioner.  There was no evidence that Petitioner sent patients to these particular pharmacies, but pharmacies have a duty to look for opioid abuse. (5 RT 1211.)  Red flags noticed by these pharmacists were generally the same:  young men in their early 20s, traveling from great distances, who paid cash, wanted brand name drugs, slurred their speech, and appeared to be sickly, anxious, restless, pale, and/or under the influence.  (5 RT 1213, 1234-1235, 1254-1269, 1280-1283, 1329-1352, 1359-1372, 7 RT 1813-1817, 1859-1864.)

his shirt so Petitioner could check his back  she didn't see anything wrong with it and suggested a back brace and heat.  Petitioner did write a prescription for Vicodin without doing any drug screening but refused to write a prescription for anything stronger without an x-ray.  (8 RT 2430-2444.)

DEA undercover agent Brian Sale went to see Petitioner to try to get OxyContin. Petitioner refused to give him OxyContin.  When he offered to pay more money she told him it was not about money. Petitioner did give him a prescription for Xanax and Vicodin after he complained about his wrist and not being able to sleep.  She cautioned him to take only 2 pills and not to use the medication to get high. (8 RT 2477-2492.)

DEA Agent Stephanie Moreland wanted Oxycontin for menstrual cramps but Petitioner refused to write a prescription.  She suggested Anaprox which is good for menstrual cramps.  (9 RT 2776.)

DEA Agent Chris Carter was unsuccessful in getting any prescriptions from Petitioner.  She actually told him never to come back. (9 RT 2824, 2835-2838, Peo. Exh. 139.)  Petitioner told Carter he was just making up reasons for wanting a prescription and that he should drink coffee rather than alcohol and try walking instead of running.  (9 RT 2824-2838, 17 CT 3388.)  Petitioner told Carter:  "If you don't need pain medicine, you shouldn't – it's not an energy bar or candy." (17 CT 3388.)

## G.    The Financial Investigation

District Attorney investigator Jose Oros, audited financial records of individuals and companies suspected of financial crimes. (14 RT 4905.) He assisted

with an audit of Advanced Care AAA Medical Group and Petitioner.[7]  (Peo. Exh. 172, 14 RT 4907.)

Oros reviewed 69 accounts from different people and isolated  15 bank accounts for Advanced Care AAA Medical Group, Inc. (14 RT 4913.) All the deposits allowed Oros to trace the money. (14 RT 4927-4928.) Two accounts listed cash deposits from the business.[8] (14 RT 4921.) The remaining accounts were deposits from insurance companies.  Oros did not count a check as cash.  (14 RT 4922.)

The audit covered 8 years, from July 13, 2004 to March 3, 2012.  The total amount Oros determined was earned by the clinic for those 8 years was $5,990,841.15.  (14 RT 4916.)

Oros did not do any analysis regarding the business's expenses or employee payroll.[9]  (14 RT 4917, 4922.)

---

[7]  District Attorney investigator Thomas Greep obtained a search warrant for financial records from thirteen banks which included accounts in the name of Petitioner, her husband, and her mother.  (Peo. Exh. 171, 14 RT 4897-4902.)

[8]  Petitioner's husband, Dr. Gene Tu, testified as a defense witness that the clinic accepted cash patients and insurance.  He and Petitioner were equal shareholders in the business.  If the patient had insurance with a company for which the clinic did not have a contract they could not accept that insurance. (24 RT 7822.) Dr. Tu explained that the various bank accounts were for: cash deposits; other deposits; payroll (with taxes deducted for employees, Petitioner, and Dr. Tu); reserve funds (interest bearing); CD investment;  Dr. Tu's previous practice; Dr. Tu's savings before he was married;  Petitioner's infectious disease practice; and their mothers' separate investment accounts unrelated to medicine. (24 RT 7847-7848.)

[9] Dr. Tu testified that out of the money earned by the clinic, there were 10 to 15 employees to pay as well as overhead.  They did not live a lavish lifestyle. (24 RT 7851-7852.)  There was also shareholder profit which amounted to $458,432, in 2010. (24 RT 7897.)

If a bank thinks there is suspicious financial activity it will report that to the IRS or the Franchise Tax Board.  Oros did not find any evidence of suspicious financial activity in these accounts.   (14 RT 4930.)

## H.   THE SECOND DEGREE MURDER COUNTS

### 1.   Vu Nguyen (Count 1)

Vu Nguyen passed away in his apartment in Lake Forest, Orange County, on March 9, 2009.  When his brother Viet Nguyen found pill bottles for OxyContin, Soma, and Xanax prescribed by Petitioner, he filed a complaint with the medical board.  (9 RT 2802-2810, 2821.)  The brother knew that Vu Nguyen regularly used drugs, including marijuana and cocaine, was recently fired from his job, broke up with his girlfriend, and was arrested for driving under the influence.  (9 RT 2815-2819.)

Vu Nguyen's girlfriend Nisha Anaya knew he took Xanax right after drinking which made him very weak and sloppy.  (10 RT 3006.)  She broke up with him because he was lying about his drug problem and endangering people by driving under the influence. (10 RT 3012.)  She had seen him try to crush OxyContin (not prescribed by Petitioner) but was unsuccessful.  She told him he needed to go to rehab.  (10 RT 3035-3037.)

The toxicologist, Dan Anderson, reviewed three reports (CURES, autopsy, and toxicology) to determine the cause of death. (12 RT 3920.) Vu Nguyen was prescribed alprazolam (Xanax), hydrocodone (Norco) and oxymorphone (Opana). (Peo. Exh. 23, 12 RT 3921.)  The manner of death was an accident.  12 RT 3923.)

Drugs detected at time of death were: alprazolam, oxymorphone, lidocaine (normally given by paramedics as life-saving measure), methadone, and

marijuana metabolite. (12 RT 3924.) The methadone and aprazolam detected in Nguyen's blood were never quantified by the Orange County coroner. (18 RT 6035, 6080.) Petitioner did not prescribe methadone. (12 RT 3927.)

Anderson determined that the cause of death was a combination of methadone, Opana, and Xanax. (12 RT 3927.) The amount of Opana was small. The methadone alone would not have killed him. (13 RT 4247.)

Dr. Walter Strauser found an extreme departure in the standard of care regarding Petitioner's treatment of Vu Nguyen over the course of six visits. (23 RT 7515.) Strauser reviewed the CURES report, the Orange County coroner's report, and medical records. (23 RT 7511.) Strauser found a departure from the standard of care based on: her evaluation of Nguyen before prescribing controlled substances for pain and anxiety; her monitoring of him over the course of six visits; and her record keeping. (23 RT 7512, 7529.)

Although Nguyen presented himself as complaining of pain in the upper neck, upper back, and right leg, there was no clear indication how he had developed this pain. Though he complained of anxiety, there was no history as to when he had developed the anxiety. Petitioner did not document his mental health or substance abuse history. Though he reported taking high doses of opioids prescribed by other doctors, Petitioner failed to contact these doctors or get the prior medical records. (23 RT 7513-7514.)

Petitioner did not do an adequate physical examination even though Vu Nguyen had very high blood pressure, which could indicate withdrawal or a metabolic disturbance. Petitioner did not do a urine drug screen, obtain a CURES report, or order any diagnostic testing. (23 RT 7514-7515.) Strauser did not find any evidence to establish a legitimate reason to prescribe Norco or Xanax. Petitioner also refilled his prescriptions early, albeit with a warning she would not do so again. (23 RT 7515-7516.)

1    In subsequent visits Petitioner prescribed other medications and

2    changed medications based on Vu Nguyen's complaints, without corroborating why

3    he needed them. (23 RT 7522-7523.)  She did not suggest he consult pain medicine

4    specialists, a chiropractor or psychiatrist.  (23 RT 7524.)

5

6    **2.    Steve Ogle (Counts 2 and 3)**

7

8    In 2007, Steven Ogle's sister-in-law Elissa lived with him in Palm

9    Springs.  Elissa knew Ogle used marijuana but never saw him use street drugs like

10   heroin or cocaine. (21 RT 6397-6398.)  In 2009, he had a car accident, requiring

11   hospitalization.  Ogle often appeared to be under the influence and abusing drugs.

12   (21 RT 6950-6951.)

13   On April 9, 2009, Riverside County Coroner Darin Hall went to the

14   scene and found Ogle deceased, slumped on couch with white foam coming from his

15   mouth.  Hall collected three prescription bottles from the bedroom, two from

16   Petitioner (methadone and aprazolam) and the third by another doctor (OxyContin).

17   (13 RT 5363-4268.)  Hall also found a loaded firearm underneath the cushion next

18   to Ogle's body.  He also had a recent linear laceration on his right forearm, indicating

19   he was suicidal.  (13 RT 4273.)

20   Dr. Ruben Escobar, a coroner investigator for Riverside County, spoke

21   to Petitioner on May 6, 2009, and told her Ogle had passed away.  (19 RT 6336.)

22   Petitioner said she was treating Ogle for back pain, neck pain, and trouble sleeping;

23   she had first seen him on March 2, 2009.  He told her he had been in a car accident

24   a few years before.  She was also aware he was abusing  OxyContin and other drugs

25   and wanted her assistance in getting off them.  She prescribed methadone and Xanax.

26   She cautioned him not to mix methadone with any other opiates. (19 RT 6338-6339.)

27   Toxicologist Anderson reviewed the CURES, death investigator,

28   autopsy and toxicology reports.  (12 RT 3929, 17 RT 5740-5745.)  Ogle was a 24

year old male with a history of prescription drug abuse including oxycodone, methadone, and alprazolam. Ogle had oxycodone (Percocet, Percodan, and OxyContin), alprazolam in his system. Anderson determined the cause of death was an accident due to multiple drug intoxication, including  alprazolam (Xanax), oxycodone, and a high amount of methadone. (12 RT 3932-3933.) The oxycodone was a small trace amount, not enough to kill. The methadone alone would not have killed him. (12 RT 3933-3943, 4030.)

Dr. Ezekiel Fink found an extreme departure from the standard of care in Petitioner's treatment of Ogle. When Ogle told Petitioner he was taking 80 milligrams of OxyContin, this was suspicious because it was an amount for a terminal cancer patient. (15 RT 5185.) Petitioner should have referred Ogle to an addiction specialist to treat his heroin addiction instead of prescribing methadone herself. (15 RT 5192-5194.) She should have insisted on a urine test to see if he was taking his medications as prescribed. However, her record keeping was not a departure from the standard of care. (15 RT 5195.)

### 3.    Joseph Rovero (Count 4)

Eric Sease was a close friend of Joseph Rovero in college, who did drugs with him such as cocaine, OxyContin, Xanax, and xoma. "He used all of them together." (11 RT 3331.)  Rovero preferred pills which he would crush and snort. In December 2009, Rovero was using 150 to 200 milligrams of OxyContin and Xanax, every day. Sease and Rovero also used ecstasy and marijuana. (11 RT 3333-3342.)

The night before he died Rovero went to Sease's graduation party, where a lot of people were doing drugs. Throughout the evening Rovero took OxyContin, Xanax, and Soma. He also drank beer and vodka. Sease knew it was dangerous to mix drugs with alcohol. He had noticed Rovero's use of drugs was

increasing. (11 RT 3341-3343.)  When Rovero left the party at 5:00 a.m. he was "pretty messed up physically." (11 RT 3338.)

The next evening, Sease and his roommate went to Rovero's condo to check on him.  They called 911. (11 RT 3339.)

Rovero's girlfriend Kelly Moreira said he regularly mixed drugs with alcohol.  He also crushed and snorted painkillers like Percocet. (13 RT 4506-4507.) In 2008 and 2009, he would drink to excess.  Moreira knew it was dangerous to mix alcohol with Percocet.  Rovero would get some of his pills from friends.  He also sold them. (13 RT 4509, 4512.) When Moreira  she spoke to Rovero the morning of December 18, 2009, he was drunk. (13 RT 4513.)

Rovero's father testified that his son injured his head in high school playing football.  His first year in college, Rovero went to the emergency room to have some glass surgically removed from his hand.  He took Vicodin for the pain. (13 RT 4516-4521.)

David Love, Maricopa County death investigator spoke to Petitioner over the phone after finding prescription bottles with her name on it  scene. (13 RT 4563.)  She said she had only seen Rovero once.  She later sent medical records to the Tempe Police Department. (13 RT 4569.)

Detective William Kelly of the Tempe, Arizona police department also spoke to Petitioner by phone.  She told him she had seen Rovero on December 9, 2009, when he was complaining of lower back pain, wrist pain, and anxiety.  Rovero provided his own wrist x-ray which showed a fracture.  He told her he was taking 6 OxyContin and Soma and wanted more.  She told him that it was inappropriate to take that amount of OxyContin so she prescribed oxycodone instead.  She also prescribed aprazolam (Xanax) and Soma.  She was going to try to wean him off the oxycodone and told him to see her again in a month. (14 RT 4854-4857.)

Petitioner saw Rovero only once. (14 RT 4857.) She had anticipated he would become a regular patient as he told her he was moving near her office. It was common to have walk-in appointments. (14 RT 4857.)

Angelee Chen, the Maricopa County coroner, determined that Rovero's cause of death was due to multiple drug toxicity, including acute ethanol intoxication, oxycodone, and alprazolam. (13 RT 4535-4536.) Rovero had frothy fluid (fome cone) in his mouth and his lungs were congested, which is characteristic of opiate overdose. (13 RT 4538-4540.) The manner of death was an accident. (13 RT 4541.)

Toxicologist Anderson reviewed the CURES, autopsy, and toxicology reports. (12 RT 3935-3956.) He determined the cause of death was combined drug toxicity, from ethanol (alcohol), oxycodone, and alprazolam. The ethanol and the oxycodone together would be enough to cause death. There was only a trace amount of alprazolam so it was not a lethal amount. (12 RT 3941.)

Dr. Walter Strauser reviewed the autopsy, CURES, and police reports, the consumer complaint filed by Rovero's mother, and medical records from another doctor and from Petitioner. (23 RT 7532.) He found an extreme departure in her evaluation prior to prescribing controlled substances. (23 RT 7532.)

Petitioner did not take an adequate history as to how Rovero's back or wrist pain began. She did not mention any prior treatment although she listed high dosages of opioids that he claimed to be taking. (23 RT 7534-7535.) Petitioner did not take a history of substance abuse, or social or family history. There was no treatment plan although she suggested heat massage, exercise, and a firm mattress. (23 RT 7536-7537.)

Petitioner did dramatically reduce the dosage of all three drugs he said he was taking. The intent to do so was a good thing. (23 RT 7537.) But without verifying what he had previously been prescribed there was a danger of either withdrawal or overdose. (23 RT 7538.)

The major red flag was that Rovero reported to be taking such high doses of opioids on a daily basis, indicating he was not credible. He appeared to be drug seeking.  Yet Petitioner did not corroborate his story. (23 RT 7541-7543.)

## I.   UNCHARGED DEATHS

### 1.   Matthew Stavron

Bruce Stavron testified that his son Matthew sustained major injuries (broken femur) beginning at age 13 from racing motorcross.  He was given morphine and Demerol.  Matthew continued to race motorcross and was injured at least 12 times in 8 years.  At age 16, he began using using marijuana and at 18, he started using harder drugs such as OxyContin and heroin. He got pills from prescriptions and from friends.  He was jailed for selling marijuana.  He was also diagnosed as bipolar, with mood swings ranging from euphoria to anger.  By 2006, Matthew was under the influence, 40 percent of the time.  His parents put him in rehab several times and also kicked him out of the house.  (10 RT 3307-3321.)

Orange County coroner investigator Victoria Reichardt went to Matthew Stavron's house on September 16, 2007, and found him deceased with a brown purge emanating from his mouth. (13 RT 4638.) After finding aprazolam, carisoprodol, and OxyContin prescribed by Petitioner, Reichardt called her. "I did identify myself, that I was with the Orange county Coroner's office regarding the death of her patient and explained why I was calling." (14 RT 4815.)  Reichardt spoke to Petitioner briefly, for five to ten minutes.  She had not determined the cause of death. (14 RT 4823.)

Petitioner told Reichardt she saw Stavron one time as a new patient on September 14.  He complained of chronic back and leg pain and anxiety due to an old injury.  She thought he was possibly drug seeking because he asked for OxyContin.  He was otherwise in good health and good spirits.  (14 RT 4814-4816.)

Subsequent investigation by Reichardt showed Stavron had a prior history of heroin use and suicide attempts. (14 RT 4823-4824.) The Orange County medical examiner determined cause of death was acute intoxication of oxycodone and alprazolam. The manner of death was undetermined. (12 RT 3946.)

Toxicologist Anderson reviewed the CURES, death investigator, autopsy, and toxicology reports. (12 RT 3944.) Drugs detected at time of death were Xanax, ocycodone, and diazepam (Valium).  They only found two of the medications that were found in his system.  The valium could not be said to be alone the cause of death; the alprazolam was on the higher edge of therapeutic but not lethal; the oxycodone alone would have killed him. (12 RT 3949.)

Dr. Strauser found an extreme departure in the standard of care as to Stavron.  The physical examination was not complete.  Petitioner failed to contact other doctors, even though he said he was already taking a large amount of drugs, and she failed to do an adequate screening for substance abuse or obtain a CURES report. (23 RT 7546.).

### 2.    Ryan Latham

Mark Latham, Ryan's father, testified that his son needed painkillers in 2007, when he broke his jaw and it was wired shut.  (10 RT 3106.)  His son had attention deficit disorder.  He injured his back base jumping in 2008. (10 RT 3111.) Ten days before his death on March 31, 2008, Ryan showed up at his father's house after being in a fight.  He also appeared to be under the influence.  Latham never threatened suicide to his father but did to his mother. (10 RT 3113-3123.)

Kelly Ralph Estrada, Orange County deputy coroner, investigated the death of Ryan Latham on March 31, 2008. (13 RT 4577.)  Latham had shaved half of his head.  His wrist had fresh superficial lacerations (hesitation marks). (13 RT 4581.)  Estrada  also found empty pill bottles, including Soma, Xanax, and

hydrocodone prescribed by Petitioner prescribed by Petitioner six days prior to death. Given that the bottles were empty Latham was not taking the pills as prescribed. (13 RT 4586-4588.) Estrada determined that the manner of death was suicide. (13 RT 4588-4589.) She learned that Latham also used heroin, speed, cocaine, and ecstacy. (13 RT 4612.)

Estrada called Petitioner on May 19, 2008, and said she was investigating the death of Ryan Latham. They spoke for five to ten minutes. Estrada requested no medical records and did not mention that Latham's death was preliminarily determined to be a suicide. (13 RT 4609-4610.) Petitioner said she prescribed hydrocodone for chronic back pain due to an old sports injury, and Xanax for anxiety. (13 RT 4590-4591.) When she last saw him, there was no indication he was suicidal or drug seeking. (13 RT 4591.)

The Orange County pathologist determined cause of death to be acute polydrug intoxication (hydrocodone, carisoprodol, diazepam, and alpraxolam). (12 RT 3953-3954.)

Toxicologist Anderson reviewed the CURES, crime lab, investigative, autopsy, and toxicology reports. (12 RT 3953.) The cause of death was suicide from acute polydrug intoxication. (12 RT 3958.)

**3.    Naythan Kenney**

Naythan Kenney's girlfriend Erin Whitney was a heroin addict (11 RT 36956.) Kenney used OxyContin, Valium, and Adderall. Whitney saw him snort drugs. (11 RT 3687.) She went with him to multiple doctor's offices to get drugs, including Petitioner's clinic. (11 RT 3701.) One day Kenney would not get out of bed and blood gushed from his nose. Whitney called 911. (11 RT 3699.) She took the medications to a neighbor's house because she had a warrant. (11 RT 3711-

3713.)  The day before, Kenney might have crushed OxyContin or taken methadone. (11 RT 3705-3709.)

Orange County deputy coroner Kelly Estrada called Petitioner on November 7, 2008, and said she was investigating the death of Naythan Kenney. (13 RT 4592.)  Petitioner said she was treating him for chronic neck and knee pain from a car accident in May 2007.  He seemed to be somewhat drug seeking as he recently requested to change from Norco to OxyContin, which is stronger.  Then he asked for methadone. (13 RT 4595.)

Kenney died on September 20, 2008.  Orange County listed cause of death as combined effects of alprazolam, amitriptyline/nortriptyline (Elavil, an antidpressant), amphetamine, carisoprodol, diazepam/nordiazepam, methadone, morphine, oxycodone, and quetiapine (Seroquel, an anti-psychotic, for bipolar disorder).  (12 RT 3962.)

Toxicologist Anderson reviewed the CURES, death investigative report, autopsy, and toxicology reports.  (12 RT 3964.)  The manner of death was an accident.  The cause of death was multiple drug toxicity, with methadone elevated substantially.  (12 RT 3965-3973.)  Petitioner is not the one who prescribed the methadone. (13 RT 4236.)

## J.    UNLAWFUL PRESCRIBING COUNTS[10]

### 1.    Joshua Chambers (Count 8)

Zachary Chambers, Joshua's brother, testified that Joshua started using heroin and prescription pills after he broke his collarbone and sustained nerve

---

[10] Due to space limitations and the issues raised, this memorandum will only discuss the evidence on counts 8 (Joshua Chambers), 10 (Joseph Gomez), and 13 (Michael Katsnelson).

damage to his left foot.  The collarbone healed, but he could not lift his foot and walked with a limp.  (11 RT 3650-3652.)

Joshua passed away on June 1, 2009.  He was found lying on the floor of his apartment with blood coming out of his nose. (11 RT 3654.)

On June 8, 2009,  Orange County deputy coroner Erica Arellano called Petitioner to tell her Joshua Chambers had died.  (20 RT6667-6669.)  At the scene Arellano found syringes and drug paraphernalia, including a spoon with black residue.  (20 RT 6674-6675.)

Petitioner was cooperative and said she treated him 10 times over 5 months for anxiety and pain in his shoulder and back from a motorcycle accident. She prescribed Xanax and hydrocodone and later changed the medication to Percocet, Opana, and dilaudid. She attempted to regulate his medications because he appeared drug-seeking and finished his medications early.  She did not suspect he was using illegal drugs but did suspect he was using alcohol.  (20 RT 6670-6675.)

Toxicologist Anderson reviewed the CURES, death investigator, autopsy, and toxicology reports.   The cause of death was the combined effects of morphine, codeine, hydrocodone/diohydrocodeine.   He also had ethanol in his system. The manner of death an accident.  (12 RT 3975-3977.) Heroin was  cause of death.  (12 RT 3979.)   The hydrocodone was not quantified and the alprazolam was not even tested for. "Heroin is the major problem here." (13 RT 4221.)

Dr. Fink found that Petitioner departed from the standard of care because she did not ask Chambers if he had a history of substance abuse despite the types and amounts of medications he told her was taking. (15 RT 5197-5198.)  He also kept showing up early which indicates he was not taking his medications properly. (15 RT 5199.)  There was no departure from standard of care with respect to her medical records which were typewritten and organized.  (15 RT 5202.)

1

### 2.     Michael Katsnelson (Count 13)

2

3        On May 6, 2009, coroner Ruben Escobar called Petitioner to tell her that

4   Michael Katsnelson had passed away and to get information from her. (19 RT 6336,

5   6339.) Petitioner said she was treating Katsnelson for lower back pain after a traffic

6   accident.  He told her he had been prescribed fentanyl from another doctor.  She

7   prescribed fentanyl and Xanax.  She advised him not to take fentanyl with any other

8   opiate to avoid an overdose.  She did not suspect he was abusing the medication

9   because she had only seen him a few times and he was not aggressive in trying to get

10   more medication.  (19 RT 6341-6342.)

11        Toxicologist Anderson reviewed the CURES, death investigation,

12   autopsy and toxicology reports.  (12 RT 3988, 19 RT 6350-6351.) The drug levels

13   detected were not lethal.  The laboratory did not test for fentanyl.  (12 RT 3992,

14   3398.) The cause of death was cardiac hypertrophy, bilateral pulmonary congestion

15   (an enlarged heart and fluid in the lungs).  (12 RT 3990.)

16        Dr. Fink found an extreme departure from the standard of care.

17   Katsnelson said he was taking OxyContin and fentanyl but Petitioner failed to take

18   a substance abuse history, obtain a CURES report, or contact his other doctors.  (16

19   RT 5406.)

20

21

### 3.     Joseph Gomez (Count 10)

22

23        Joseph Gomez's grandmother Barbara Temple testified that he lived

24   with her and her husband for a while but they had issues with his drug use. He was

25   addicted to pain pills and also used street drugs.  He once overdosed on heroin in her

26   home. He had back problems in high school from playing football and lifting

27   weights.  (11 RT 3665-3676.)

28

1    Kelly Estrada also investigated the death of Joseph Gomez, who was

2    found lying face up on the floor of his bedroom.  He had a large amount of frothy

3    purge coming from his nose.  There was an injection site to his inner left thigh.  (13

4    RT 4601.)  Estrada called Petitioner on December 3, 2009, and said she was

5    investigating the death of Joseph Gomez.  (13 RT 4606-4607.)

6    Petitioner saw Gomez once a month between August 2008, and

7    February 2009.  Then he did not come back for six months.  She was treating him for

8    back pain and anxiety but did not know the source of the pain.  She  counseled him

9    about visiting multiple doctors to receive medications.  (13 RT 4608.)

10    Dr. Sean Enloe performed the autopsy on Joseph Gomez.  He noticed

11    scars on his legs consistent with people who inject drugs.  (19 RT 6420-6421.)  The

12    amount of morphine in Gomez was consistent with overdose and with heroin use.

13    (19 RT 6427-6431.)  The level of morphine detected was fatal in and of itself so they

14    did not quantify the other drugs detected.  (19 RT 6433-6436.)

15    Dr. Fink found an extreme departure from the standard of care because

16    Petitioner did not take a history of substance abuse even though Gomez reported

17    taking large amounts of numerous drugs in unusual combinations.  Petitioner did not

18    check CURES, do additional screening, or contact his other physicians. (15 RT 5205-

19    5206.)  There were also indications he was going through withdrawal, not using

20    medications properly.  (15 RT 5213-5214.)

21

22    **K.    The Opinion of the Court of Appeal**

23

24    As noted in the petition for rehearing, the opinion of the Court of

25    Appeal overlooked and/or made numerous material misstatements of fact.  Therefore

26    it is not entitled to a presumption of correctness under § 2254(e)(1).  *Taylor v.*

27    *Maddox*, 366 F.3d at 1000.  For example:

28

The opinion states that when pharmacies refused to fill prescriptions from Petitioner she referred them to "'mom and pop' pharmacies which continued to fill her prescriptions." (Exhibit 1, Slip opn. at p. 5.) This is inaccurate. There was no evidence presented that she referred them to any such pharamcies.

The opinion states that law enforcement investigators, including investigators from the coroner's office, began calling Tseng to discuss the deaths of several of her patients and to apprise her that the patients had died of suspected drug overdoses shortly after obtaining prescriptions from her." (Exhibit 1 at 5.) This is inaccurate. While coroner investigators did call Petitioner after a patient died, the evidence presented shows only that they asked her what she was treating them for. There was no evidence presented that they told her the patients had died of drug overdoses, much less that it was her prescriptions which caused the deaths. Evidence presented also showed that Petitioner fully cooperated with coroner questions. Coroner investigators are not the ones who would determine cause of death in any event. (See 19 RT 6336 [investigator Escobar]; 13 RT 4563 [investigator David Love]; 14 RT 4854-4857 [investigator William Kelly]; 13 RT 4638, 4815-4823 [investigator Kelly Reichardt]; 13 RT 4609-4610, 4590-4592 [investigator Ralph Estrada]; 20 RT 6667-6669 [investigator Eric Arellano].)

The opinion states that Petitioner entered "alerts" in her medical records after she became aware of the deaths and that she "altered" the medical records. (Exhibit 1 at 5.) While some of the records have "alerts" as to possible drug overdose, the evidence presented showed that at most there was additional information added to a medical record years later and never that the record had been changed or altered. (15 RT 5143-5154.)

The opinion states that Petitioner nevertheless "continued her prescribing practices until she was arrested in 2012," implying that she was indifferent to warnings that told her she was responsible for her patients' deaths. (Exhibit 1 at 6.) The implication is not warranted. Not only was there no evidence

34

presented that Petitioner was told by anyone prior to her arrest that her prescribing practices were the cause of her patients' deaths, the opinion fails to mention that when Petitioner was put on notice that patients were merely drug seeking, she immediately terminated any contact with them.  For example, the opinion fails to mention the following:

Once  a patient stole some syringes from a cabinet.  Petitioner confronted him and refused to see him again.  Another patient cracked the door and had to be taken away by his friend.  Another patient was upset at being turned away.  (7 RT 1944-1945, 1970.)

Patient Michael Cook overdosed in the office.  Petitioner called the paramedics who revived him Narcan.  (20 RT 6611-6619.)  Petitioner refused to see Cook again and would not even take his calls.  (7RT 1976-1980.)

DEA investigator Robert Harkins instructed the undercover officers to lie to Petitioner to get drugs from her. (4 RT 1008-1009.)  The first undercover DEA officers were unable to obtain the prescriptions from Petitioner that they asked for.  (5 RT 1232.)

DEA Agent Chris Carter was unsuccessful in getting any prescriptions from Petitioner.  She actually told him never to come back. (9 RT 2824, 2835-2838, Peo. Exh. 139.)  Petitioner told Carter he was just making up reasons for wanting a prescription and that he should drink coffee rather than alcohol and try walking instead of running.  (9 RT 2824-2838, 17 CT 3388.)  Petitioner told Carter:  "If you don't need pain medicine, you shouldn't – it's not an energy bar or candy." (17 CT 3388.)

The opinion's factual recitation as to the uncharged patient deaths is highly misleading.  For example, as to Nathan Kenney – the opinion misspells his name as "Keeney" – the opinion says that Petitioner prescribed him methadone.  (Exhibit 1 at 13.) The toxicologist testified that Petitioner prescribed Nathan Kenney four drugs on September 16, 2008, four days before he died:   Oxycontin

(oxycodone), Xanax (alprazolam); Adderall (amphetamine); and Soma (carisoprodol). (12 RT 3961- 3962.)

The opinion states that Petitioner's "patients Chambers, Gomez, and Katsnelson also succumbed to drug overdoses." (Exhibit 1 at 13.) The opinion fails to mention that Joshua Chambers died of a heroin overdose, which had nothing to do with Petitioner. (12 RT 3979; 13 RT 4221.) The opinion fails to mention that Joseph Gomez also died of morphine and heroin overdose, which had nothing to do with Petitioner. (19 RT 6427-6436.) The opinion fails to mention that Michael Katsnelson died of a heart condition, which had nothing to do with Petitioner. (12 RT 3990.)

The opinion states that another patient "Latham" died from a Norco overdose, which Petitioner had prescribed. (Exhibit 1 at 13.) The opinion fails to mention that Latham's cause of death was officially determined to be a suicide. (12 RT 3958.)

The opinion states that Petitioner learned of the drug overdose deaths of Chambers, Gomez, and Katsnelson before she began treating "murder victim Rovero." (Exhibit 1 at 14.) Here again, this is misleading. Chambers and Gomez died from heroin overdoses, which had nothing to do with Petitioner. Latham died by suicide, which had nothing to do with Petitioner. And, Katsnelson died from a heart condition, which had nothing to do with Petitioner.

As to Kenney, Petitioner prescribed four drugs in the days before he died: Oxycontin (oxycodone); Xanax (alprazolam); Adderall (amphetamine); and Soma (carisoprodol). (12 RT 3961- 3962.) Kenney's death was attributed to methadone, which was not one recently prescribed.

The opinion also failed to mention that Dr. Ezekiel Fink, one of the prosecution's expert witnesses on standard of care testified that opioid overdose deaths happen to good doctors in the course of their practices as well. A death "does not mean that something wrong was done." (16 RT 5450.)

# V. CLAIMS FOR RELIEF

## I.  THE EVIDENCE THAT PETITIONER WAS GUILTY OF SECOND DEGREE MURDER AS TO VU NGUYEN (COUNT ONE) WAS INSUFFICIENT

### A.  Introduction

The prosecution contended that Petitioner was guilty of second degree murder under an implied malice theory because she had been informed prior to Vu Nguyen's death that three of her patients had passed away.  Despite being so notified, Petitioner continued prescribing in a reckless manner.

However, the prosecution put on no evidence that when the coroners contacted Petitioner they told her what the cause of death was – they did not know at that point.  Nor is there any evidence that they told her they knew or suspected that she was responsible for her patients' deaths.  The coroners contacted Petitioner to get information *from her* and she complied.[11]

The prosecution actually put on other evidence that when Petitioner was aware that a patient was abusing drugs or making up reasons for seeking a prescription she refused to see that patient again.  Even if Petitioner violated the standard of care as to Vu Nguyen (e.g. inadequate examination), at most the evidence showed that she was guilty of involuntary manslaughter.

---

[11] Defense counsel repeatedly objected that the only notice given to Petitioner was a brief phone call that did not inform her of what drugs were in the patients' systems or what the cause of death was.  (See e.g. 15 CT 2944 [995 motion]; 6 RT 1504.)

## B.     Standard of Review

The proper standard of review for a claim of insufficient evidence is "whether after viewing the evidence in the light most favorable to the prosecution, any *rational* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

In *In re Winship,* 397 U.S. 398, 363-364 (1970), the United States Supreme Court:

> "held for the first time that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In so holding, the Court emphasized that proof beyond a reasonable doubt had traditionally been regarded as the decisive difference between criminal culpability and civil liability.  The standard of proof beyond a reasonable doubt, said the Court, 'plays a vital role in the American scheme of criminal procedure,' because  it operates to give 'concrete substance' to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding.  At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself."

*Jackson v. Virginia*, 443 U.S. at 315.

The Supreme Court noted that *Winship*:

> "presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as

1       evidence necessary to convince a trier of fact beyond a reasonable

2       doubt the existence of every element of the offense."

3 *Jackson v. Virginia*, 443 U.S. at 316.

4       The high court recognized that even a properly instructed jury can

5 "occasionally convict when it can be said that no rational trier of fact can find guilt

6 beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 317.  When this

7 happens, "such a conviction in a state trial" "cannot constitutionally stand." *Id.* at

8 318.

9       After the AEDPA, the federal courts "apply the standards of *Jackson*

10 with an additional layer of deference."  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th

11 Cir. 2005).  When the state court of appeal did "not apply a standard fundamentally

12 at odds with Supreme Court precedent and/or did not reach a different result based

13 on materially indistinguishable facts," "we agree with our sister circuits who have

14 addressed the issue that we must ask whether the decision of the California Court of

15 Appeal reflected an 'unreasonable application of' *Jackson* and *Winship*, to the facts

16 of his case." *Id.* at 1275.

17

18     **C.**    **Second Degree Murder**

19

20       Murder is the unlawful killing of a human being "with malice

21 aforethought." (PC § 187, subd. (a).)  Second degree murder is the "unlawful killing

22 of a human being with malice aforethought but without the additional elements, such

23 as willfulness, premeditation, and deliberation, that would support a conviction of

24 first degree murder." *People v. Knoller,* 41 Cal.4th 139, 151 (2007).

25

26

27

28

### 1.     Implied Malice

Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. *People v. Blakeley,* 23 Cal.4th 82, 87 (2000); *People v. Nieto Benitez*, 4 Cal.4th 91, 102 (1992).

> "Malice is implied when the killing is proximately caused by 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with **conscious disregard for life**." (Citation) In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another."

*People v. Knoller*, *supra*, 41 Cal.4th at p. 143, citing *People v. Phillips,* 64 Cal.2d 574, 587 (1966) (emphasis added.)

There is a physical and a mental component to implied malice. *People v. Cravens,* 53 Cal.4th 500, 508 (2012). The physical component is the "performance of an act, the natural consequences of which are dangerous to life," and the mental component is the "requirement that the defendant knows that his conduct endangers the life of another and ... acts with a conscious disregard for life." *Id.*, citing *People v. Chun,* 45 Cal.4th 1172, 1181 (2009).

### 2.     Proximate Cause

The principles of causation apply to crimes as well as torts. A defendant may be liable for criminal homicide when his acts were "the proximate cause of the death of the victim, even though he did not administer the fatal wound." *People v. Hansen*, 59 Cal.App.4th 473, 479 (1997). "Negligence on the part of the victim is not a defense to criminal liability." *Id*. However, "cases have consistently held that the

free will of the victim is seen as an intervening cause which breaks the chain of causation." *Id.* at 481 (citations omitted).

In homicide cases, a cause of death "is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of the decedent and without which the death would occur. *People v. Cervantes*, 24 Cal.4th 860, 866 (2001). Proximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating. *Id.*

> "In general, an independent intervening cause will absolve a defendant of criminal liability. However, in order to be independent, the **intervening cause must be unforeseeable** ... an extraordinary and abnormal occurrence, which rises to the level of an exonerating superseding cause."

*People v. Cervantes*, supra, 24 Cal.4th at 871 (citations omitted, emphasis added.)

> "On the other hand, a dependent intervening cause will not relieve the defendant of criminal liability. A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve the defendant of liability. The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act."

*People v. Cervantes*, 24 Cal.4th at 870 (citations omitted).

"It has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." *People v. Sanchez*, 26 Cal.4th 834, 846 (2001).   "To be considered a proximate cause" the acts of the defendant "must have been a substantial factor contributing to the result." *People v Pike*, 197 Cal.App.3d 732, 745 (1988). See *People v. Catlin*, 26 Cal.4th 81, 155 (2001) (When there are concurrent causes of death, the defendant is criminally responsible if his or her conduct was a substantial factor contributing to the result) ; and *People v. Jennings*, 50 Cal.4th 616, 634, 642-644 (2001) (When there are multiple concurrent causes of death, the jury need not decide whether the defendant's conduct was the primary cause of death, but need only decide whether the defendant's conduct was a substantial factor in causing the death).

### D.   Involuntary Manslaughter

Involuntary manslaughter is the:

"commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. This subdivision shall not apply to acts committed driving a vehicle."

Penal Code § 192(b).

Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. *People v. Butler*, 187 Cal.App.4th 998, 1006 (2010) citing *People v. Rios*, 23 Cal.4th 450, 460 (2000).  The mens rea for murder is specific intent to kill or conscious disregard for life.  Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter.  *Id*.

Through statutory definition and judicial development, there are three types of acts that can constitute involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony.  For all three types of predicate acts the required mens rea is criminal negligence.  *People v. Butler*, supra, 187 Cal.App.4th at 1006.

> "Criminal negligence exists when the defendant engages in conduct that is aggravated, culpable, gross, or reckless, i.e., conduct that is such a departure from what would be conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences."

*People v. Butler*, supra, 187 Cal.App.4th at 1008, citing *People v. Penny*, 44 Cal.2d 861, 879 (1955).

When a defendant commits a lawful act or a noninherently dangerous felony with criminal negligence, the defendant is presumed to have had an awareness of, and conscious indifference to, the risk to life, regardless of the defendant's actual belief.  *People v. Watson*, 30 Cal.3d 290, 296 (1981).

> "Both murder (based on implied malice) and involuntary manslaughter involve a disregard for life; however, **for murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard.** Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved.  In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk.  Thus, even if the defendant had a subjective, good faith belief that his

or her actions posed no risk, involuntary manslaughter culpability is

warranted if the defendant's belief was objectively unreasonable."

*People v. Butler*, supra, 187 Cal.App.4th at 1008-1009 (citations omitted, emphasis added).

### E.   The Evidence of Proximate Cause Was Insufficient

Viewing the evidence in the light most favorable to the prosecution, the toxicologist ultimately determined that Nguyen died from an overdose of methadone, Opana, and Xanax.  Petitioner did not prescribe the methadone.  (12 RT 3927.) Because the Orange County coroner did not quantify the level of drugs detected in Nguyen's system, it was impossible to know which drug was the most prevalent. There was also some marijuana metabolite detected.   (12 RT 3926, 18 RT 6080.) The oxymorphone (Opana) was not a massive amount.  (12 RT 3926.)

Petitioner did prescribe the Opana and the Xanax.  Even if there was a departure from the standard of care (23 RT 7511-7514), there is no evidence for which a rational juror would find beyond a reasonable doubt that Petitioner's prescriptions were a substantial factor in the cause of death.  *People v. Pike*, 197 Cal.App.3d at 745.  The methadone on top of these other drugs was an unforeseen intervening event.  *People v. Cervantes*, 24 Cal.4th at 870.

### F.   The Evidence of Implied Malice Was Insufficient

The prosecution's theory as to why Petitioner was guilty of second degree murder under an implied malice theory as to Vu Nguyen (count 1), Steven Ogle (count 2), and Joseph Rovero (count 4), was that she had been previously been informed by coroners that patients of hers had died.  Nevertheless, she did not change her prescribing habits.  Therefore, she appreciated the risk but had a

"conscious disregard, "I Don't care. I'm going to continue to prescribe like I'm prescribing." (23 RT 8497.).  As the prosecutor stated in closing argument:

> "Specifically, she was told that, in 2007, Matthew Stavron overdosed and died at age 25.
>
> She got a call from the coroner's investigator saying that Ryan Latham died, at 22 years old.
>
> She also got a call that, in the that same year, Naythan Kenney overdosed and died at age 34.
>
> She learned of the death of Vu Nguyen in 2009, when he overdosed and died at the age of 29.
>
> Each one of these deaths followed by a phone call telling the defendant 'Your  patient has died.  What were you treating them for?'
>
> The overdose death of Steven Ogle, 28 years old.
>
> She also got a call in 2009, just days after steven Ogle passed away, that her patient Michael Katsnelson had now overdosed and passed away at the age of 23.
>
> She received notification that her patient Joshua Chambers overdosed at age 24.
>
> That Joseph Gomez overdosed at age 26.

1    And, lastly, in December of 2009, Joey Rovero overdosed at age 21."

2    (26 RT 8496.)

3

4          Viewing the evidence in the light most favorable to the prosecution, the

5    evidence showed only that Petitioner was contacted by coroners' offices about the

6    death of a patient.  She was never told that anything she had done was the cause of

7    or contributed to that death.

8    •    On September 16, 2008, Orange County coroner investigator Victoria

9          Reichardt spoke to Petitioner for five to ten minutes and told her that

10         Matthew Stavron had died.  Reichardt asked Petitioner for information.

11         Reichardt did not know the cause of death.  (14 RT 4815, 4822-4823.)

12         There was no evidence that Reichardt informed Petitioner that she was

13         somehow responsible for Stavron's death.

14   •    On May 19, 2008, Orange County deputy coroner Kelly Estrada spoke

15         to Petitioner and told her Ryan Latham had died.   She asked Petitioner

16         for information. She did not tell Petitioner the preliminary cause of

17         death was thought to be suicide. (13 RT 4609-4610.)  There was no

18         evidence that Estrada informed Petitioner that she was somehow

19         responsible for Latham's death.

20   •    On November 7, 2008, Estrada called Petitioner and told her that

21         Naythan Kenney had died.  She asked Petitioner for information.  (13

22         RT 4592-4593.)  There is no evidence that Estrada informed Petitioner

23         what the cause of death was or that Petitioner was somehow responsible

24         for Latham's death.

25

26         Vu Nguyen passed away on March 9, 2009. (9 RT 2802-2810.)  As

27   noted above, the toxicologist ultimately determined that Nguyen died from an

28   overdose of methadone, Opana, and Xanax.   Petitioner did not prescribe the

methadone. (12 RT 3927.) Because the Orange County coroner did not quantify the level of drugs detected in Nguyen's system, it was impossible to know which drug was the most prevalent. (12 RT 3926, 18 RT 6080.)

Even if there was a departure from the standard of care in her treatment of Nguyen, no rational juror could find beyond a reasonable doubt that Petitioner had a "conscious disregard" "of engaging in conduct that endangers the life of another." *People v. Knoller*, *supra*, 41 Cal.4th at 143. As Dr. Fink testified, overdose deaths happen to good doctors in the course of their practice as well. A death "does not mean that something wrong was done." (16 RT 5450.)

Further, viewing the evidence in the light most favorable to the prosecution, there was also evidence that Petitioner did not deliberately engage in conduct that endangered another with a conscious disregard for life. *People v. Knoller*, *supra*, 41 Cal.4th at 143.

- When Michael Cook overdosed in Petitioner's clinic, she called 911 and was cooperative with the paramedics. Afterwards she refused to see Cook again and would not even take his calls. (7RT 1976-1980.)
- Petitioner refused to write prescriptions for DEA undercover agents for OxyContin. (5 RT 1232.)
- Petitioner told DEA undercover agent Chris Carter that he was just making up reasons for wanting a prescription and told him never to come back. (9 RT 2824, 2835-2838.) She told him that pain medicine was "not an energy bar or candy." (17 CT 3388.)

Dr. Strauser opined that there was an extreme departure of care because Petitioner's physical examination of Nguyen was inadequate and she failed to document or verify his mental health and/or substance abuse history. (23 RT 7513-7514.) Given that the evidence of implied malice was insufficient, Petitioner's conviction should be reduced to involuntary manslaughter, based on the departure

from the standard of care.  Involuntary manslaughter  requires a showing that a reasonable person would have been aware of the risk.  Even if Petitioner had a "subjective, good faith belief that her or her actions posed no risk, involuntary manslaughter culpability is warranted if the defendant's belief was *objectively unreasonable*." *People v. Butler*, supra, 187 Cal.App.4th at 1008-1009 (emphasis added).

### G.    The Opinion of the Court of Appeal Relied on Three Cases That Were Inapposite

Petitioner conceded that her actions were negligent.  She argued that the evidence is insufficient to support second degree murder and requested that the Court of Appeal reduce her convictions to involuntary manslaughter.[12]  (AOB at 57-77.) The opinion agreed that "a departure from the medical standard of care alone would not be sufficient to support an implied malice finding." (Exhibit 1 at 17.)  The opinion relied on three cases to support implied malice murder in this case.  All of these cases are inapposite.

The opinion relied on *Einaugler v. Supreme Court of State of N.Y.,* 109 F.3d 836 (2nd Cir. 1997), where a doctor was convicted of reckless endangerment after he prescribed feeding a patient through her dialysis catheter rather than her feeding tube and then wilfully delayed her hospitalization.  (Exhibit 1 at 22.) Because he grossly deviated from a reasonable person's conduct and disregarded a

---

[12]   Under California law, the appellate court has the power to reduce the defendant's conviction to involuntary manslaughter under PC §§ 1181(6) and 1260.  An appellate court may modify the judgment, "if the evidence shows the defendant to be not guilty of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein." See also *People v. Navarro*, 40 Cal.4th 668, 671 (2007); *People v. Odle,* 37 Cal.2d 52, 56-58 (1950).

substantial and unjustifiable risk, the evidence was sufficient support reckless endangerment. *Id*. Of course, reckless endangerment is not comparable to second degree implied malice murder. Most important, the opinion fails to mention that Dr. Einaugler's sentence for his conviction of reckless endangerment was a mere 52 weekends in jail. *Einaugler v. Supreme Court of the State of New York,* 918 F. Supp. 619, 624 (E.D.N.Y. 1996). This case is completely irrelevant.

The opinion relied on *People v. Klvana,* 11 Cal.App.4th 1679 (1992), where a doctor was convicted of implied malice second degree murder after nine infants died. The opinion notes the doctor repeatedly ignored signs of medical distress during delivery. (Exhibit 1 at 23.) Significantly, the opinion failed to mention that Dr. Klvana was told numerous times by others at hospitals where he worked that his performance was substandard and he was a danger to his patients. *Klavana* at 1686-1687. He subsequently applied for privileges at other hospitals without disclosing that he had been warned about his practices and was on probation. He then purchased a community care medical clinic advertising deliveries for "no risk pregnancies" despite the fact that the clinic license did not permit delivery of babies. *Id*. at 1687. By contrast, Petitioner was never told by anyone prior to the deaths of Messrs. Nguyen, Ogle, and Rovero, that her medical practices were substandard or endangering her patients. If anything, *Klvana* supports Petitioner's position that the evidence of implied malice murder was insufficient.

The opinion also relies on *People v. Stiller,* 242 Mich.App. 38, 43 (200). (Exhibit 1 at. 23.) The opinion said that the Michigan appellate court affirmed implied second degree malice murder after a doctor prescribed high doses of hydrocodone unrelated to rational medical treatment and where the doctor had been warned about his dangerous prescribring practices. (Exhibit 1 at 23-24.) The opinion, however, failed to mention that the doctor had been treating this patient for many years and he was present at the patient's apartment on the day of her death for much of the day. The apartment manager encountered the doctor at the apartment

looking "very agitated and sweaty." *Stiller,* at 41, 45. Further, not one single witness – not one – testified that they warned Petitioner that her prescribing practices were dangerous or negligent. It cannot be overemphasized that the prosecution presented no evidence whatsoever that Petitioner was put on notice that any of her patients died due to her actions. Not one single coroner investigator or pharmacist confronted Petitioner personally with concerns about her conduct prior to the deaths of the patients in question.

Further, the opinion of the Court of Appeal is not entitled to deference because it is an objectively unreasonable application of the facts to clearly established United States Supreme Court precedent. 2254(d)(2); *Wiggins v. Smith*, 539 U.S. 510, 528, (2003).

"[T]he state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 106 (2011).

## II.    THE EVIDENCE THAT PETITIONER WAS GUILTY OF SECOND DEGREE MURDER AS TO STEVEN OGLE (COUNT TWO) WAS INSUFFICIENT

As noted above, Vu Nguyen passed away on March 9, 2009. (9 RT 2802.) The prosecution put on no evidence as to when Petitioner was informed that Mr. Nguyen had passed away. The evidence indicates that Jennifer Doll of the Medical Board began to investigate Petitioner after Nguyen's sister found some prescription bottles with Petitioner's name on them in Nguyen's belongings. It is unknown what doctor was associated with the empty prescription bottles found when Nguyen was taken to the hospital. (21 RT 7007-7019.)

Steven Ogle passed away a month after Mr. Nguyen, on April 9, 2009. (12 RT 3931.) Orange County coroner investigator Ruben Escobar called Petitioner on May 6, 2009, to inquire what she had been treating him for. (19 RT 6336.)

The toxicologist determined the cause of death was multiple drug overdose, including a substantial amount of methadone. (12 RT 3932-4030.) Petitioner did prescribe methadone. (19 RT 6338.)

Dr. Fink found an extreme departure of care because, among other things, Ogle had admitted to Petitioner that he was using heroin. Rather than prescribing methadone to treat the heroin addiction, which she was not licensed to do, she should have referred him to an addiction specialist. (15 RT 5192-5194.)

Here again, the evidence put on the by the prosecution amounted to no more than involuntary manslaughter. There was no evidence that a rational juror could find beyond a reasonable doubt that Petitioner had a "conscious disregard" "of engaging in conduct that endangers the life of another." *People v. Knoller*, *supra*, 41 Cal.4th at 143. Petitioner's attempt to treat Ogle's heroin addiction herself was objectively unreasonable and thus constituted involuntary manslaughter. *People v. Butler*, supra, 187 Cal.App.4th at 1008-1009 (emphasis added).

The opinion of the Court of Appeal is not entitled to deference because it is an objectively unreasonable application of the facts to clearly established United States Supreme Court precedent. 2254(d)(2); *Wiggins v. Smith*, 539 U.S. 510, 528, (2003).

"[T]he state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. at 106.

### III.   THE EVIDENCE THAT PETITIONER WAS GUILTY OF SECOND DEGREE MURDER AS TO JOSEPH ROVERO (COUNT FOUR) WAS INSUFFICIENT

After Steven Ogle passed away, three more of Petitioner's patients passed away.

Joshua Chambers passed away on June 1, 2009. Orange County deputy coroner Eric Arellano called Petitioner on June 8, 2009, to tell her that Chambers had died. Arellano did not tell her that he found heroin paraphernalia at the scene. Petitioner was cooperative and said she did not suspect Chambers was using illegal drugs. (20 RT 6670-6675.) It was later determined that Chambers died of a combination of drugs with heroin being the cause of death. (12 RT 3977-3979.)

Michael Katsnelson passed away on May 6, 2009. Coroner Ruben Escobar called Petitioner on that day to tell her he had died and to get information from her. (19 RT 6336-6339.) It was later determined that Katsnelson died from cardiac hypertrophy, bilateral pulmonary congestion. (12 RT 3990.)

Coroner investigator Kelly Estrada called Petitioner on December 3, 2009, to tell her that Joseph Gomez had died. Estrada did not tell Petitioner that the cause of death was preliminarily determined to be suicide. (13 RT 4609-4610.) The cause of death was ultimately determined to be an overdose of morphine or heroin. (19 RT 6433-6436.)

Joseph Rovero passed away on December 18, 2009. Maricopa County, Arizona detective William Kelly called Petitioner about Rovero. Petitioner had seen Rovero only once, on December 9, 2009. (13 RT 4563-4568.)

It was later determined that Rovero died of multiple drug toxicity (coxycodone and alprazalom) and ethanol intoxication. His blood alcohol concentration was .10 per deciliter, more than the legal limit. (13 RT 4546-4557.) The night before Rovero died he had been using multiple drugs and drinking beer

and vodka at a party. He attended several parties that night. (20 RT 6721.) Rovero had a long history of mixing drugs with alcohol. (13 RT 4506-4507.) The ethanol and oxycodone was enough to cause death. (12 RT 3940.)

Rovero told Petitioner he was moving near her office. He brought his own wrist x-ray and told Petitioner he had been taking 6 OxyContin daily. She told him it was inappropriate to the take that much OxyContin and gave him a prescription for oxycodone. She was going to try to wean him off of that as well. (14 RT 4856-4857.)

Dr. Strauser found an extreme departure from the standard of care because Petitioner did not determine the cause of the wrist pain, did not contact Rovero's prior doctors, and did not determine his history of substance abuse. Although the intent to reduce the dosage of the drugs he had been taking was a good thing, he might have gone into withdrawal if what he had told her was accurate. (23 RT 7532-7541.)

Given that Rovero died because he had been mixing drugs with alcohol, something he did routinely, the prosecution failed to prove that Petitioner's treatment of him proximately caused his death. Petitioner saw Rovero only once. That Rovero would use drugs and drink, and to an excess, at the same time was an unforeseeable intervening event. *People v. Cervantes*, 24 Cal.4th at 870.

Further, even if there was a departure from the standard of care in her treatment of Rovero, no rational juror could find beyond a reasonable doubt that Petitioner had a "conscious disregard" "of engaging in conduct that endangers the life of another." *People v. Knoller*, *supra*, 41 Cal.4th at 143. Viewing the evidence in the light most favorable to the prosecution, Petitioner was not put on notice that she was somehow responsible for the deaths of Vu Nguyen, Steven Ogle, Joshua Chambers, Michael Katsnelson, or Joseph Gomez. As to Chambers, Katsnelson, and Gomez, Petitioner was not found to be responsible for their deaths. Katsnelson died of heart problems and both Chambers and Gomez died of heroin overdose. Viewing

the evidence in the light most favorable to the prosecution, there was no evidence upon which a rational juror could find implied malice beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. at 319.

The departure from the standard of care – failure to do an adequate physical examination, failure to contact prior physicians, and failure to determine Rovero's history of substance abuse – shows that Petitioner's treatment of Rovero was objectively unreasonable and thus amounted to involuntary manslaughter. *People v. Butler*, supra, 187 Cal.App.4th at 1008-1009 (emphasis added).

The opinion of the Court of Appeal is not entitled to deference because it is an objectively unreasonable application of the facts to clearly established United States Supreme Court precedent. 2254(d)(2); *Wiggins v. Smith*, 539 U.S. at 528.

"[T]he state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. at 106.

## IV. THE ADMISSION OF SIX UNCHARGED DEATHS UNDER EVIDENCE CODE SECTION 1101(B) VIOLATED PETITIONER'S RIGHT TO DUE PROCESS BECAUSE IT WAS NOTHING MORE THAN PROPENSITY EVIDENCE

### A. The Defense Moved to Exclude Evidence of Uncharged Deaths as Irrelevant and Prejudicial

On January 7, 2015, defense counsel filed a motion in limine to exclude, inter alia, evidence of uncharged patient deaths. (16 CT 3039.) Counsel moved under *Daubert v. Merrill Doe Pharmaceuticals, Inc.,* 509 U.S. 579 (1973), to exclude expert testimony as to the cause of death of any patients other than those charged in

counts 1, 2, and 4, as a violation of Penal Code section 187, because there was "insufficient evidence to support any expert testimony on the exact cause of death of these patients." (16 CT 3039.)  The prosecution had not yet produced any such expert.  Even if the evidence were remotely relevant, any probative value was substantially outweighed by the danger of unfair prejudice.  (16 CT 3039-3040.)

The prosecution had failed to put on any evidence that the uncharged deaths provided notice to Petitioner about her medical practice.

"At rock bottom, the Government's proffer reduces to an effort to place before the jury the alleged fact of more than 15 uncharged patient deaths while offering nothing as to (1) what the bare fact of these alleged deaths informed Defendant, (ii) how the deaths provided notice to Defendant related to anything about their care of these or any other patients, or (iii) how the mere fact that these patients allegedly died put Defendant on notice about anything related to their provision of legitimate medical care in the course of the doctor-patient relationship–the actual issues implicated by the charges in this case." (16 CT 3040.)

Counsel said "close scrutiny" of the discovery and the preliminary hearing reveals that with all of the patients who passed away, "it is clear" that Petitioner was "never notified as to how or why the patients had died, or that her prescriptions were involved." (16 CT 3041.)  The notice was "cursory, usually only a phone call or quick interview and there was no follow up." (16 CT 3041.) (See Claims I, II, and III, above.)  The discovery also showed that the prosecution "cannot and does not intend to prove at trial the cause of death for any of the patients other than the three who are the subject of the 187 counts." (CT 3041.)

In its opposition, the prosecution asserted that it intended to introduce sufficient expert testimony to demonstrate that uncharged deaths were probative of

the homicide charges.  (16  CT 3051.)  Under Evidence Code section 1101(b) (to prove motive, opportunity, intent, preparation, plan, knowledge or absence of mistake), the uncharged prior deaths would show "the defendant's patients died as a result of the prescriptions issued by the defendant." (16 CT 3053.)  The evidence was relevant to show that Petitioner had "actual knowledge that her prescriptions could, and in fact did, kill her patients." (CT 3053.)

The prosecution also intended to introduce evidence of uncharged deaths as probative of implied malice.  The prosecution relied on three cases where physicians were convicted of implied malice murder based on medical services provided to patients who died.  However, none of these cases involved prescribing narcotics.  (16 CT 3056-3058, citing *People v. Protopappas*, 201 Cal.App.3d 152; (1988)*; People v. Brown*, 91 Cal.App.4th 246 (2001); and *People v. Klvana,* 11 Cal.App.4th 1679.

The prosecution asserted *erroneously* that "numerous investigators from the coroner's office testified that they spoke to the defendant and notified her that her patients were overdosing and dying," prior to the deaths of Vu Nguyen, Steven Ogle, and Joseph Rover. (16 CT 3059.) The prosecution argued that Petitioner, as a trained physician had a subjective awareness of the risks involved in prescribing drugs after being notified of the deaths of Matthew Stavron, Ryan Latham, and Naythan Kenney." (16 CT 3061.)

The evidence cited from the preliminary hearing (testimony of Victoria Reichardt and Kelly Ralph), however, showed no more than that an investigator called Petitioner, told her a patient had died, and asked Petitioner for information. There was no evidence that in any of these calls the coroner informed Petitioner that she was believed to be responsible for their deaths.  (16 CT 3059-3960.)

On February 27, 2015, at the hearing on the motion in limine, defense counsel reiterated that there had been no expert testimony that Petitioner caused the deaths of the uncharged patients. Defense counsel, therefore,  did not know whether

1   she would need a toxicologist.  The court suggested that out of an abundance of

2   caution the defense should get a toxicologist.  (2 RT F-5-F-6.)

3              Defense counsel asked the prosecution to provide a list of which

4   patients it intended to allege Petitioner had caused or contributed to their deaths.  The

5   prosecution responded that "it's all in the preliminary hearing transcript." (2 RT F-7.)

6   Defense counsel told the court if the prosecution was limiting itself to what had

7   already been provided in discovery, the court should review those reports to

8   determine whether to exclude the evidence or not.  (2 RT F-10.)

9              The court denied the defense motion in limine saying it was not inclined

10  to exclude evidence of uncharged deaths.   Its ultimate ruling would depend on

11  whether the People could establish the requisite foundation and/or make offer of

12  proof.  (2 RT F-12-F-14.)

13             Because the prosecution was relying on Evidence Code section 1101(b),

14  the evidence that Petitioner's patients "purportedly died as a result of the

15  prescriptions issued by her and/or her medical treatment of them" was relevant to

16  "demonstrate that the defendant had actual knowledge that her prescriptions could

17  and in fact did kill her patients." (2 RT F-15.)

18             Evidence of uncharged deaths "goes directly to the element of implied

19  malice for the purposes of the homicide charges."  (2 RT F-16.)  It also goes to

20  intent, and lack of mistake or accident under section 1101(b) and/or "that the

21  defendant appreciated the risks associated with her alleged reckless conduct of

22  prescribing certain drugs that purportedly resulted in the deaths of the alleged

23  victims in this case." (2 RT F-16.)

24             The court did not discuss whether the challenged evidence actually

25  provided notice.  The court concluded that the evidence was relevant, admissible

26  under section 1101(b), and not more prejudicial than probative. (2 RT F-17.)

27             On August 27, 2015, as jury selection was underway, defense counsel

28  filed a motion in limine seeking to require the prosecution to specify and make an

offer of proof as to what alleged conduct it would offer under section 1101(b). (17 CT 3262.)  Counsel stressed that because the prosecution was weaving together charged and uncharged conduct it was difficult to determine exactly what conduct it was going to introduce and for what purpose.  The prosecution's notice of intent was not specific.  (17 3262- CT 3263.)  The prosecution had yet to make an offer of proof and asserted generally that Petitioner was "on notice" that prescription narcotics caused the deaths of those patients.  (17 CT 3264.)

The prosecution responded that it had "proven up" the 1101(b) evidence in the preliminary hearing and did not need to make an offer of proof at this time. (17 CT 3276.)  The prosecution was going to introduce evidence of the deaths of Matthew Stavron, Ryan Latham, and Naythan Kenney. (17 CT 3276-3278.) Further, under 1101(b) an uncharged crime did not need to occur before a charged crime to be admissible and relevant. (17 CT 3279, citing *People v. Balcom*, 37 Cal.2d 865 (1951), *People v. Balcom*, 7 Cal.4th 414, 425 (1994).

On August 28, 2015, at the hearing on the motion, the court said it "stands by its ruling that it made back in February." (3 RT 601.)  It goes to intent, lack of mistake, continuing plan or scheme, "even after the murders." (3 RT 601.) "It goes to notice of deaths. ¶ An overdose goes to implied malice, that aspect of the charges, of the 187 showing a reckless disregard of human life." (2 RT 602.)

Defense counsel was  concerned, however, that there was a danger that the jury would be confused and use the evidence of death as proof of overprescribing. (2 RT 602.)  The court acknowledged "counsel has a point" and directed the prosecution to sanitize the evidence so that it was not overly prejudicial. The prosecution could put on evidence that Petitioner "continued to prescribe drugs illegally, without getting into the deaths, the fact that these people died." (2 RT 604.)

The court clarified that as to the two uncharged deaths that occurred after the last alleged murder victim, "the evidence that they died is excluded," but "the evidence that they overdosed is fine." (2 RT 642.)

**B.   Evidence of Uncharged Misconduct May Never Be Introduced to Show That a Defendant Is a Bad Person**

Evidence Code section 1101 subdivision (a) provides in pertinent part that "evidence of a person's character or a trait of his or her character ... is inadmissible when offered to prove his or her conduct on a specified occasion." Section 1101 subdivision (b) allows:

> "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ... other than his or her disposition to commit such an act."

"[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." *People v. Ewoldt*, 7 Cal.4th 380, 401–402 (1994).

Under Evidence Code section 210, relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action,

Under Evidence Code section 352, the trial court:

> "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The admission of any evidence that involves crimes other than those for which a defendant is being tried has a "highly inflammatory effect" on the trier of fact. *People v. Thompson,* 27 Cal.3d 303, 314 (1980).  The admissibility of such

evidence must therefore be "scrutinized with great care." *Id*. Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." *People v. Felix,* 14 Cal.App.4th 997, 1004 (1993).

> "The prejudicial effect of this evidence is heightened by the circumstance that defendant's uncharged acts did not result in criminal convictions. This circumstance increased the danger that the jury might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses, and increased the likelihood of 'confusing the issues' [citing Evid. Code, § 352] because the jury had to determine whether the uncharged offenses had occurred."

*People v. Ewoldt, 7* Cal.4th at 405.

The prosecution must prove the uncharged act by a preponderance of evidence. *People v. Carpenter,* 15 Cal.4th 312, 382 (1997). The appellate court reviews the admission of uncharged misconduct evidence for abuse of discretion. *People v. Ewoldt*, 7 Cal.4th at 405. "Erroneous admission of other crimes evidence is prejudicial if it appears reasonably probable that, absent the error, a result more favorable to the defendant would have been reached." *People v. Felix*, supra, 14 Cal.App.4th at 1007–1008.

The erroneous admission of evidence may also offend due process when its introduction is fundamentally unfair. *McKinney v. Rees* 993 F.2d 1378, 1384 (9th Cir. 1993). In *People v. Falsetta,* 21 Cal.4th 903, 903, 913 (1999), the California Supreme Court recognized that section 1101 was a longstanding rule necessary to assure due process. The United States Supreme Court has "expressly left open the question whether a state law permitting admission of propensity evidence would violate due process principles. *Id.*, citing *Estelle v. McGuire,* 502 U.S. 62, 75 (1991).

"The rule excluding evidence of criminal propensity is nearly three centuries old in the common law." *Falsetta*, 21 Cal.4th at 913, citing e.g. *Wigmore*, Evidence (3d ed. 1940) § 194, pp. 646-647 and *People v. Ewoldt*, 7 Cal.4th at 392 (rule excluding evidence of criminal disposition derives from early English law and is currently in force in all American jurisdictions by statute or case law); see also *United States v. Castillo*, 140 F.3d 874, 881 (10th Cir. 1998) (ban on propensity evidence dates to 17th century England and early United States history); *McKinney v. Rees*, 993 F.2d at 1380-138, and n.2 (rule of exclusion for propensity evidence has persisted at least since 1684 to the present day and is established in every United States jurisdiction).

"Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character (citation) but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise, and undue prejudice." *Michelson v. United States*, 335 U.S. 469, 475-476 (1948).

**C.    The Trial Court Abused its Discretion by Failing to Scrutinize the Evidence Which Did Not Show Notice**

Defense counsel repeatedly pointed out that the prosecution's evidence did not show notice.  The evidence amounted to no more than a phone call to Petitioner that a patient had passed away.  The only offer of proof the prosecution gave before the court ruled on the in limine motion did not support its assertion that the evidence was necessary to show notice, or any basis for admissibility under section 1101 subdivision (b).

Citing to the preliminary hearing, the prosecutor wrote: "Victoria Reichhardt testified that she called the defendant on January 16, 2008. (PHT, Vol. 3, p. 42, II, 15-17)." (15 CT 2983.)  Reichhardt told Petitioner Matthew Stavron had died and inquired about his treatment. (15 CT 2983.)   There was nothing in Reichardt's testimony that showed she believed or had information  Petitioner was responsible for Stavron's death.

The same is true for the prosecution's citation to the preliminary hearing testimony of Kelly Ralph [Estrada].   The prosecutor wrote that Ralph called Petitioner on May 19, 2008, and "informed the defendant she was investigating the death of Ryan Latham." (15 CT 2983.)  Six months later, Ralph called Petitioner to tell her that another patient, Naythan Kenney, had died.  Then, on December 3, 2009, Ralph called Petitioner to tell her that Joseph Gomez had died.  (15 CT 2984.)  There was nothing in Ralph's testimony that indicated that she believed or had information that Petitioner was responsible for these deaths.

Not only did the trial court fail to scrutinize the actual evidence  before admitting it, the testimony given by Reichardt and Ralph Estrada did not change at the trial.  As discussed in Claims I, II, and II above, Petitioner was never given notice that her actions were responsible for the deaths of Matthew Stavron, Ryan Latham, and Naythan Kenney.

As to the three patients who were charged in the overprescribing counts – Joshua Chambers, Michael Katsnelson, and Joseph Gomez -- here again Petitioner was never put on notice that she was responsible in any way for their deaths.  The coroner investigators who called Petitioner told her only that they had passed away and asked Petitioner for information.   Gomez and Chambers both overdosed on heroin.  Katsnelson died of a heart condition.  Latham died by suicide.

Had the trial court reviewed the evidence of uncharged alleged misconduct carefully as it was required to do, the court would have found the prosecutor's asserted reason for introducing it was inaccurate.  The evidence was therefore inadmissible. *People v. Thompson,* 27 Cal.3d at 314; *People v. Felix,* 14 Cal.App.4th at 997, 1004   The trial court abused its discretion in permitting the prosecution to put on evidence of six uncharged deaths. (*People v. Ewoldt*, 7 Cal.4th at 405.

**D.    Petitioner Was Severely Prejudiced by the Admission of Six Uncharged Deaths**

The jury had trouble reaching a unanimous verdict as to  second degree murder.  (18 CT 3505.)  In convicting Petitioner of second degree murder it is more than likely that the jury was punishing Petitioner for the uncharged offenses. *People v. Ewoldt, 7* Cal.4th at 405.  The prosecution used these uncharged deaths to show that Petitioner was a bad person with a disposition to commit murder, in violation of section 1101 subdivisions (a) and (b) and due process. *McKinney v. Rees*, 993 F.2d at 1384; *People v. Falsetta*, 21 Cal.4th at  913.

The prosecution's emphasis on six uncharged patient deaths and its inaccurate characterization that these deaths put Petitioner on notice was so inflammatory that Petitioner could not get a fair trial. *People v. Thompson,* 27 Cal.3d at 314.   The erroneous admission of evidence may offend due process when its

introduction "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Dowling v. United States,* 493 U.S. 342, 353 (1990).

Had the six uncharged deaths been properly excluded there is a reasonable probability that Petitioner would not have been convicted of second degree murder in counts 1, 2, and 4. *People v. Felix*, supra, 14 Cal.App.4th at 1007–1008.) Because the admission of this evidence also violated due process, the error had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 636.

As noted above, the opinion of the Court of Appeal is not entitled to deference under 2254(d)(2) because it failed to acknowledge that Chambers and Gomez died from heroin overdoses, which had nothing to do with Petitioner. Latham died by suicide, which had nothing to do with Petitioner. And, Katsnelson died from a heart condition, which had nothing to do with Petitioner.

The petition should be granted. *Kipp v. Davis*, 971 F.3d 939, 2020 LEXIS 26312 (9th Cir. 2020) (granting 2254 habeas petition under 2254(d)(2) for admission of other act evidence under Evidence Code § 1101(b) because California Supreme Court opinion failed to acknowledge, inter alia, the dissimilarities between the two crimes.)

> Because the state court made a crucial factual error and failed to consider the entire state court record, we conclude that its decision was based on an unreasonable determination of the facts and hold that Kipp's due process right to a fair trial was violated.

LEXIS 26312 [*45].

**V.    THE FAILURE TO STRIKE JOHN MATA'S TESTIMONY AND DISMISS COUNT 14 AFTER THE PROSECUTOR COMMITTED MISCONDUCT DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS**

**A.    In Violation of the Court's Order, the Prosecutor Elicited from Witness John Mata, That His Son Nicholas Had Died**

As discussed above, the trial court ordered the prosecution not to mention the death of any individuals named in the overprescribing counts and who passed away after Joseph Rovero (count 4) had died.  (2 RT 642.)  Nicholas Mata was named as an individual in count 14, for whom Petitioner had unlawfully prescribed hydrocodone on February 10, 2010. (14 CT 2647.)

The prosecution called his father John Mata to testify.  The prosecutor first asked him to identify his son.  (11 RT 3347.)  The next question was: "And when did your son pass away?"  (11 RT 3347.)  Mr. Mata answered, "5/14/2010," to which the prosecutor responded, "May 14 of 2010?" (11 RT 3347.)

Defense counsel objected at sidebar that "only the evidence of an overdose was to come in" and that the "death was to be excluded." (11 RT 3347.) The court agreed that it had instructed the prosecutor to tell the witness not to mention the death, but declined to tell the jury to disregard it, believing it would only "highlight it." (11 RT 3348.)  However, the court told the prosecutor not to "let it happen again," to which the prosecutor said, "I concede." (11 RT 3348.)  The court cautioned, "You're on notice." (11 RT 3348.)

After Mr. Mata started to testify, defense counsel objected at sidebar that the prosecutor needed to tell the witness not to mention the death.  The

prosecutor said it was "my fault" that he had "elicited the question" even though he told the witness the night before not to talk about death. (11 RT 3349.)

Thereafter Mr. Mata resumed testifying. After he said he had trouble grasping his son's drug problems, he broke down. The court asked him if he wished to take a break. (11 RT 3355.) Defense counsel also asked if they could take a break, but Mr. Mata said he would not take one. The court told the prosecutor to "get him off the stand" and "move on." (11 RT 3355.)

Mr. Mata said he found pill bottles with Petitioner's name on it. When his son was arrested for possession of a controlled substance, he refused to bail him out. He also overdosed in his presence. (11 RT 3357-3359.)

Before beginning cross-examination, defense counsel objected that the prosecutor had committed misconduct. Even though this was an overprescribing count, the first question from the prosecutor was when his son had died. (11 RT 3359.) "This testimony should be stricken and the count relating to Nicholas Mata should be dismissed." (11 RT 3360.) "This was far more prejudicial than probative .... and it was an absolute outrageous attempt to prejudice this jury." (11 RT 3360.)

The court said that the prosecutor had to prove there was no legitimate basis for the prescription and did not find that the testimony about death was prejudicial, "meriting dismissal of the charge based on prosecutorial misconduct." (11 RT 3360.)

During cross-examination, Mr. Mata said he saw his son a month before he died. (11 RT 3362.)

After Mr. Mata was finished testifying the court told the jury to take an early lunch as it needed to discuss something with the attorneys. The court asked Juror No. 10 if he/she was okay. The juror responded that "this has been a little emotional." (11 RT 3364.) Juror No. 8 asked: "To the point that it's been emotional, can we have a Kleenex box in the jury box?" (11 RT 3364.) The court said it would "see to it." (11 RT 3364.)

The court addressed the attorneys:

"Let me just state this, and to some extent Ms. Green is correct.

With the 1101(b) evidence presented, witnesses should be up and down, take the stand and off they go.

The parameters that are being set is unlawful prescription, so what's relevant is that they are in possession of bottles, is that the bottles indicated defendant, if at all, as well as any indicia of any health reasons because it goes to the viability of the prescription.

Whether they were taking it with alcohol, whether they were taking it as crushed pills, whether they were taking other street drugs, whether they were in rehab, all of that is totally irrelevant, absolutely irrelevant.

And it's irrelevant to the murder charges, but not to the 1101(b) because it's the unlawful prescription.

So keep that in mind, narrow the scope, and up and down they go.

To some extent, I agree with Ms. Green that that was – just don't let that happen again, Mr. Niedermann.  That was an oversight on your part with respect to the death, but we've had – we've addressed that already." (11 RT 3365.)

Defense counsel reminded the court that John Mata was not an 1101(b) witness.  He "volunteered again that the son had died, even after being instructed.  ¶ And I'm moving that the count relating to the overprescribing for Nicholas Mata

1  be dismissed." (11 RT 3365.)  The court denied the motion, but told the prosecutor
2  that there was no reason for the witnesses to be "up there for a prolonged time." (11
3  RT 3366.)

4  The court added that it had been watching that juror and "at one point,
5  I thought she couldn't wait to get out."  (11 RT 3366.)  The bailiff said:  "I inquired,
6  and she says it's more emotional, not physical." (11 RT 3366.) After the court again
7  said it was watching the juror, defense counsel said she was:

8  "very concerned, Your Honor.  These overprescribing counts are not the
9  murder counts.  It's being put in a blender, making it very difficult for
10  the jury to determine what is the death count, and what is just an
11  overperscribing count.  They have no idea.

12
13  And emotion is exactly what the People are trying to get in, and that's
14  why it's more prejudicial than probative, and that was no accident when
15  that question came out on direct." (11 RT 3367.)

16
17  The court told the prosecutor that "whether someone has OD'd, for purpose of these
18  counts, it's not relevant." (11 RT 3367.)

19  After the lunch recess, defense counsel renewed her request that the
20  testimony of John Mata be stricken and that count 14 be dismissed because the
21  prosecutor had elicited the death.  She also asked that the jury be admonished not to
22  consider the death or overdose of Nicholas Mata for purposes of deciding the
23  overprescribing allegation.  (11 RT 3370.)

24  The court denied the motion to strike or dismiss but did admonish the
25  jury:

26  "One thing I did want to say, the last witness Mr. Mata, testified about
27  his son, Nicholas Mata.  Now, you should understand that count 14
28  relates to Nicholas Mata and in that case – in that charge it is alleged -

again an allegation – that the defendant unlawfully prescribed a controlled substance.

It doesn't go to murder, it doesn't go to death, so the fact that Mr. Mata might have testified about that – count 14 states on or about February 1, 2010, an overprescribing occurred on that date – and it was emotional testimony.  But the death has nothing to do with this charge, the defendant is not being charged with that, so please do not consider that evidence for any purpose.

What you're to consider is whether or not that charge of unlawful prescribing a substance has been committed, proof beyond a reasonable doubt." (11 RT 3371-3372.)

### B.    After the Prosecutor Committed Misconduct it Was Impossible for Petitioner to Get a Fair Trial

"A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state." *People v. Hill,* 17 Cal.4th 800, 819 (1998) (death penalty conviction and judgment reversed for pervasive prosecutorial misconduct). As stated long ago, a prosecutor's,"interest in a criminal prosecution is not that it shall win a case, but that justice shall be done .... He may prosecute with vigor -- indeed, he should do so.  But, while he may strike hard blows he is not at liberty to strike foul ones." *Berger v. United States,* 205 U.S. 78, 88 (1935).

"A prosecutor's intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."

*People v. Hill*, *supra*, 17 Cal.4th at 819.

A finding of misconduct does not require a determination that the prosecutor acted in bad faith or with wrongful intent. To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and seek an admonition if an objection and admonition would have cured the harm. *People v. Kennedy,* 36 Cal.4th 595, 617-618 (2005), disapproved on another ground in *People v. Williams,* 49 Cal.4th 405, 459 (2010).

It is misconduct to ask questions calling for inadmissible and prejudicial answers. *People v. Pitts*, 223 Cal.App.3d 606, 734 (1990). In addition the:

"prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement. "

*People v. Warren*, 45 Cal.3d 471, 481-482 (1988).

Prosecutorial misconduct violates the federal Constitution when it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).

Here, the trial court's failure to strike John Mata's testimony and dismiss count 14, so infected the trial with unfairness as to make the resulting convictions on all counts, a denial of due process. The prosecutor conceded that he violated the court's order. John Mata was very emotional during his testimony and twice testified that his son had died. The admonition to the jury to disregard the death did not cure the harm. The jury was overcome with emotion. (11 RT 3364.)

The highly emotional yet completely irrelevant testimony that Nicholas Mata had died – all elicited in violation of a court order – made it impossible for Petitioner to get a fair trial.  As discussed above, the six uncharged deaths did not provide notice to Petitioner that her prescribing practices were illegitimate and served only to unfairly prejudice the jury.  Nicholas Mata's death just added fuel to the fire.

On appeal, Respondent Attorney General and the Court of Appeal agreed that the prosecution[13] committed misconduct by mentioning – in violation of a court order – that two more patients of appellant had died (Nicholas Mata and Michael Huggard).  (Exhibit 1 at 39.)  The Court of Appeal denied relief, however, on the ground that the misconduct was not so pervasive as to deny due process under *Darden v Wainwright,* 477 U.S. 161, 181 (1986), because the jury had already heard evidence of nine uncharged patient deaths.  (Exhibit 1 at  39-40.)

Actually, it was three uncharged deaths (Stavron, Latham, Kenney). The jury heard that another three patients died who were the subject of unlawful prescribing counts (Chambers, Katsnelson, and Gomez) for a total of six deaths. Once again, the opinion failed to acknowledge that the death of four of these six could not in any sense be attributable to appellant:  Latham committed suicide; Chambers and Gomez both died of a heroin overdose; and Katsnelson died of a heart condition.  The opinion is not entitled to deference and relief must be granted under 2254(d)(2).  *Taylor v. Maddox*, 366 F.3d at 1000.

The prosecutor's misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993).  This is particularly so, since the testimony was highly emotional as well

---

[13] One of the prosecutor's in this case, Deputy District Attorney Grace Rai, has previously been found by the Court of Appeal (Division Eight) to have committed misconduct requiring reversal of a murder conviction.  *People v. Broughton*, 2008 Cal.Unpub. LEXIS 8814 (1988) (B196573) .

as irrelevant, and the jury was initially hung on second degree or manslaughter. *See infra*.

## VI. THE TRIAL COURT'S FAILURE TO GRANT A MISTRIAL WHEN THE PROSECUTOR AGAIN COMMITTED MISCONDUCT BY ELICITING THAT MICHAEL HUGGARD (COUNT 11) DIED, VIOLATED PETITIONER'S RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENT

During the testimony of the Anthony Juguilon, the Orange County coroner who did an autopsy on Ryan Latham (17 RT 5760-5763) and Naythan Kenney (17 RT 5773), the prosecutor asked him if he had also performed an autopsy on Michael Huggard, who died on October 26, 2010. (17 RT 5784.) Defense counsel objected that "this is evidence of another instance of prosecutorial misconduct." (17 RT 5785.) Huggard was named in count 11 (14 CT 2646) and passed away after the three murder counts so his death was not to be mentioned. (17 RT 5785-5786.)

The prosecutor said he thought Huggard had died in 2009, but Juguilon confirmed that it was in 2010. Defense counsel said this was "basically, just an invited mistrial by the People." (17 RT 5786.) The court denied the motion for mistrial but reminded the prosecutor that "if it's outside that window, the death was not to be mentioned." (17 RT 5878.)

After the lunch recess, the prosecutor said he had researched the matter and determined Huggard died in 2010. He had in good faith believed it was in 2009, and did not mean to "circumvent the courts decision." (17 RT 5789.) Significantly however, the prosecutor failed to mention that a few days before, on September 16, 2017, the People told the court that it would not be presenting evidence as to the

deaths of Michael Huggard and Donald Bender, "trying to avoid that John Mata issue." (12 RT 3967.)

The prosecutor said he was removing the autopsy report of Huggard from the exhibit books and agreed that the jurors should be admonished not to consider it. The People would in good faith continue to abide by the court's ruling and denied any intention to mislead the jury. The prosecutor disagreed that a mistrial was called for. (17 RT 5789-5790.)

The court said the request for a "mistrial is noted but denied." (17 RT 5790.) The court found the prosecution had not acted in bad faith and ruled the evidence was not more prejudicial than probative. (17 RT 5790.)

The court reiterated that the evidence was not relevant and (17 RT 5794) and admonished the jurors not to consider anything about the death of Michael Huggard. "It has nothing to do with this case, and that was a mistake." (17 RT 5798.) Any testimony they had heard about death, "disregard it." (17 RT 5798.)

In general, a motion for a mistrial should not be granted unless the defendant's chances of receiving a fair trial have been irreparably damaged. *People v. Collins,* 49 Cal.4th 175, 198 (2010), citing *People v. Ayala*, 23 Cal.4th 225, 282 (2000). A motion for a mistrial should be granted if the prejudice cannot be cured by admonition or instruction. *People v. Panah,* 35 Cal.4th 395, 491-492 (2005).

Typically, the denial of a mistrial motion is reviewed for abuse of discretion. *People v. Ayala, supra,* 23 Cal.4th at 282; *People v. Panah*, *supra*, 35 Cal.4th at 491-492. However, a different standard may apply if the objectionable evidence pertains to the main issue in the case and the proof of guilt is not clear or convincing. *People v. Hardy*, 33 Cal.2d 52, 61-62 (1948). Under those circumstances, "the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard the evidence." *Id.* at 61.

The court abused its discretion by not granting the motion for mistrial. As noted above, this was the second time that the prosecution violated the court's

order not to mention anything about the death of a patient who died after Joseph Rovero in December 2009.  This was now the eighth uncharged death of a patient that the jury had been told about (Stavron, Latham, Kenney, Chambers, Katsnelson, Gomez, Mata, and Huggard), in addition to the three second degree murder counts (Nguyen, Ogle, and Rovero).  There was no way the jury could impartially consider the evidence as to either the murder counts or the overprescribing counts without considering eight additional deaths.

The prosecutor's assertion that it had not realized Huggard died in 2010, is not believable given that the People had just a few days before told the court it would not bring out Huggard's death to "avoid the John Mata issue." (12 RT 3967.) Nevertheless, even if the prosecutor did not elicit Huggard's death on purpose but because of forgetfulness, it still amounted to misconduct that so "fundamentally unfair as to deny [her] due process." *Donnelly v. DeChristoforo*, 416 U.S. at 645.

The failure to grant a mistrial was extremely prejudicial.  Not only was the testimony highly emotional, but the jury was initially hung on second degree versus involuntary manslaughter.

The prosecutor's misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993).  Petitioner is entitled to relief under 2254(d)(2).  There is no possibility for fairminded disagreement.  *Harrington v. Richter*, 562 U.S. at 106.

**VII.  THE COURT'S REOPENING OF CLOSING ARGUMENT OVER DEFENSE OBJECTION WHEN THE JURY STATED IT COULD NOT REACH A UNANIMOUS VERDICT ON SECOND DEGREE MURDER COERCED A UNANIMOUS VERDICT IN VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS**

**A.    Relevant Facts**

The jury began deliberations at 9:05 a.m. on Monday, October 19, 2015. (29 RT 9301.)   At 10:40 a.m. the jurors asked for the prosecution exhibits and handouts in which they had taken notes. After discussion with the parties, the court said it would give them the exhibits that were marked and admitted.  (18 CT 3485, 29 RT 9307.)

At 1:45 p.m. that same day, the jury had another question.   "Please define for the jury the following phrase from the jury instructions page 42, number 1, 'not in the usual course of professional treatment.'" (18 CT 3484, 29 RT 9312.) The court ascertained that the jury was inquiring about the definition of Health and Safey Code section 11153(a) and responded that the "statement speaks for itself" and to "apply the ordinary everyday definitions of the words used in that instruction." (29 RT 9312-9313/9600.)

The jury recessed at 3:30 p.m. on October 19, 2015.   (29 RT 9313/9600.)

The jury deliberated all day Tuesday, October 20, 2015.   (29 RT 9601/9900.)

On Wednesday, October 21, 2015, the jury submitted another question. "Count 15 is for a prescription written on October 5, 2009 (People's  evidence 84), but the prescription we have is for October 30, 2009. ¶ Is there a copy of the October 5, 2009 prescription, or is the charge actually for October 30, 2009." (18 CT 3489,

29 RT 9909.)  Over defense objection, the court informed the jury that count 15 would be conformed to proof for October 30, 2009.  The court also told the jurors to consider all the counts in conjunction with all the evidence. The jury recessed at 3:45 p.m. (29 RT 9910/10200.)

The jury deliberated all day Thursday, October 22, Friday October 23, Monday October 26, and Tuesday, October 27, 2015.  (29 RT 10201/10500-11101/11400.)

On Wednesday, October 28, 2015, the jury commenced deliberations at 9:05 am.  At 3:15 p.m. the jury submitted another note:

> "We, the jury in this case, submit the following request or question of
> the court;
> Do we have to be unanimous in not guilty of second degree to
> deliberate on manslaughter?
> What if we are split on second degree?"

(18 CT 3505, 29 RT 11402.)

After discussion with the parties, the court read instruction 17.49, and said he would give them a copy of it as well:

> "In this case, the defendant has been charged with second-degree
> murder in counts 1, 2, and 4, all felonies.  The foregoing charged crimes
> include the lesser offenses of involuntary manslaughter.
>
> You will be given guilty and not guilty verdict forms encompassing
> both the charged crimes and the lesser included offenses.
>
> Since the lesser offenses are included in the greater, you are instructed
> that if you find the defendant guilty of the greater offenses, you should
> not complete the verdicts on the corresponding lesser offenses, and

those verdicts should be returned to the court unsigned by your foreman.

If you unanimously find the defendant not guilty of the felonies charged, you then need to complete the verdicts on the lesser included offenses by determining whether the defendant is guilty or not guilty of the lesser included crimes, and the corresponding verdicts should be completed and returned to the court signed by your foreman."

(29 RT 11408.)

The court also reminded the jurors to consider the evidence pertaining to counts 1, 2, and 4, separately from one another and to carefully review the evidence from the six week trial. (29 RT 11408.)  The jury recessed for the day at 3:50 p.m.  (29 RT 11409/11700.)

The next morning, Thursday, October 29, 2015,  the court said it would further instruct the jury, per defense counsel's request (18 CT 3512), that they could consider the charges in no particular order.  Both sides had also asked for ten additional minutes of argument.

However, when the bailiff informed the jury that they would be given an additional instruction and would hear ten additional minutes of argument, the jury said they were agreeable, but they had resolved the issue that was in the question propounded to the court.  (29 RT 11702.)  The court said if the jury indicated it would help, it would allow additional argument, but if it was no longer needed it, it was disinclined to allow the further argument.  (29 RT 11703.)

At that point, defense counsel objected to further argument:

"Your Honor, I just want to clarify.  ¶ Initially, the defense had agreed, we didn't object, to the argument, but then upon my research during the break, I cited that the – under *People v. Young*, 156 Cal.App.4th 1165,

that the California rules and law permit reopening argument only if the jury is deadlocked.

I also cited California Rule of Court 2.1036, where the court can employ further action to assist the jury reaching a verdict if the jury has indicated that they would need it.

And with that, the defense objects to reopening argument." (29 RT 11703.)

The court said, "It appears that they're deadlocked based on their questions yesterday, or at least they were divided, and so the court can allow it under those circumstances, as well." (29 RT 11704.)

The court then instructed that involuntary manslaughter was a lesser included offense on counts 1, 2, and 4, and that the jury was to determine whether the defendant was guilty or not guilty of those charges or an lesser crimes.  (29 RT 11706.)

"In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it.  You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdicts.

However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged greater crime." (29 RT 11706.)

After the court inquired whether the jury would find ten additional minutes of argument helpful, a brief recess was taken.  The jury then submitted a written request to hear additional argument. (18 CT 3512, 29 RT 11707-11708.) The court clarified that this request was in response to the court's inquiry.  (29 RT 11708.)

Both sides gave additional argument.  (29 RT 11708-11721/12000.) The jury then continued to deliberate that day from 11:26 a.m. to 3:25 p.m.  (29 RT 11721/12000.)

The jury resumed deliberations the next day at 9:04 a.m.   At 3:20 p.m. the jury reached a verdict.  (29 RT 12002.)  Petitioner was convicted of second degree murder in counts 1, 2, and 4.  She was found not guilty of count 22, but guilty on the remaining counts, (29 RT 12003-12010.)

### B.     Reopening Argument Was Coercive

#### 1.     Coercing a Deadlocked Jury into Returning a Unanimous Verdict Is Coercive

When a trial court coerces a deadlocked jury into returning a unanimous verdict, due process is violated.  *Lowenfield v. Phelps,* 484 U.S. 231, 237 (1987); *Weaver v. Thompson*, 197 F.3d 359, 365  (9th Cir. 1999).  "A court's actions in employing multiple means of overcoming jury deadlock pose a significant risk of impermissibly shifting the government's burden of proof in violation of the defendant's due process rights."  *United States Evanston*, 631 F.3d 1090, 1091 (9th Cir. 2011).  "Whether the comments and conduct of the state trial judge infringed defendant's due process right to an impartial jury and fair trial turns upon whether the 'the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision.'" *Jiminez v.*

*Meyers,* 40 F.3d 976, 979 (9th Cir. 1993) quoting United *States v. Mason* 658 F.2d 1263, 1268 (9th Cir. 1981).

In order to determine whether there was jury coercion, the trial court's supplemental charge must be evaluated "in its context and under all the circumstances." *Lowenfield*, 484 U.S. at 237, quoting *Jenkins v. United States,* 380 U.S. 445, 446 (1965).

### 2.   The Trial Court Has Discretion to Permit Additional Argument So Long as it Is Not Coercive

Penal code section 1140 provides:

"Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

California Rule of Court Rule 2.1036 (b)(3) (assisting jury at impasse) permits a judge to authorize additional argument when the jury has reached an impasse.  But it does not require a judge to do so.

In *People v. Rodriguez,* 42 Cal.3d 730 (1996), the California Supreme Court held that "the determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. *Id.* at 774, citing *People v. Rojas,* 15 Cal.3d 540, 546 (1975).  The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." *People v. Carter,* 68 Cal.2d 810, 817 (1968).

"Whether statements of a trial judge amount to coercion of a verdict is peculiarly dependent upon the facts of each case." *People v. Carter*, 62 Cal.2d at 817. Jury coercion can occur even where there is no "intimation, express or implied, that the court favors a particular verdict." *Id.* "The basic question" is:

> "whether the remarks of the court, viewed in the totality of applicable circumstances, operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency. Such a displacement may be the result of statements by the court constituting undue pressure upon the jury to reach a verdict, whatever, its nature, rather than no verdict at all.

*People v. Carter*, supra, 68 Cal.2d at 817.

### 3. Additional Argument over Defense Objection after Two Supplemental Instructions Were Already Given Was Coercive

The trial court had already given two supplemental instructions when the jury indicated it could not reach a unanimous verdict on second degree murder. The jury's note that it was split came after seven days of deliberation. (18 CT 3505.)

At no time did the court inform the jury that it was not required to reach a unanimous verdict. At no time did the court inform the jurors that they should not surrender its conscientiously held beliefs in order to secure a verdict for either party.

It was not that the jury initially asked for additional argument. The jury told the bailiff it had resolved the issue with respect to the question about being split on second degree. (29 RT 11702.) However, once the court suggested it could hear additional argument, the court implied that a unanimous verdict was necessary. As such, the suggestion to the jury that it could hear additional argument on top of the two supplemental instructions was coercive. *People v. Rodriguez*, 42 Cal.3d at 744.

The opinion of the Court of Appeal found that "even if the trial court erred in allowing further argument, there was no reasonable probability that Tseng suffered prejudice as a result of that decision." (Exhibit 1 at 43.)  The court failed to consider the issue under federal due process standards.  The state court error in reopening closing argument over defense objection "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 636.

## VIII.   PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO A FAIR TRIAL AND TO DUE PROCESS WERE VIOLATED BY CUMULATIVE ERROR

The United States "Supreme Court has clearly established that the combined effect of multiple errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Parle v. Runnels* 505 F.3d 922,  927  (9th Cir. 2007) citing *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973). Under traditional due process principles, cumulative error warrants habeas relief where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo,* 416 U.S. at 643.

The United States Supreme Court has held that cumulative error requires relief to be granted. See *Taylor v. Kentucky,* 436 U.S. 478, 487 and n.15 (1978) ("The cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness."); *Chambers v. Mississippi*, supra, 410 U.S. 284, 302-303 ([combined effect of individual errors 'denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial."). *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) ("erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.").

The California Supreme Court has also found that "a series of trial errors, though independently harmless, may in some instances rise by accretion to the level of reversible and prejudicial error." *People v. Hill,* 17 Cal.4th 800, 844-845 (1998) (cases cited therein).

The multiple cumulative errors in this case require reversal.

- There was no evidence to prove that Petitioner had a conscious disregard of engaging in conduct that endangered the life of another to support implied malice;

- The prosecution put on evidence of uncharged deaths which amounted to no more than unlawful propensity evidence;

- Four of the uncharged deaths had nothing to do with Petitioner;

- The prosecution twice committed misconduct by eliciting evidence in violation of a court order that two additional people had died;

- The court's permitting additional argument over defense objection when the jury said it was split on second degree, coerced a unanimous verdict.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus should be granted.

Date: September 30, 2020          Respectfully submitted,

/s/ verna wefald

VERNA WEFALD

Attorney for Petitioner Hsiu Ying Tseng

# CERTIFICATE OF SERVICE

I certify that on September 30, 2020, I served a copy of:

Form Petition for Writ of Habeas Corpus by a Person in State Custody, 28 U.S.C. § 2254; Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254; Exhibits.

on the following:

LANCE WINTERS
Deputy Attorney General
300 S. Spring Street
Los Angeles, CA 90013

By electronic service to:

Lance.Winters@doj.ca.gov

Ms. Hsiu-Ying Tseng
WF4177
California Institution for Women
16756 Chino-Corona Road
Corona, CA 92880

By U.S. Mail first class postage prepaid

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of September 2020, at Pasadena, California.

/s/ verna wefald

_____
Verna Wefald, Declarant